## Jones *against* Janney.

Lands bordering on the flats of a river and the flats in front naturally go together, and therefore the flats pass in a conveyance of the land described as running by the course of the river.

An express exception is required in the grant or some unequivocal declaration or certain immemorial usage, to limit the title to the edge of the river.

The nature of the right to flats on a river.

One having land in front of a river by conveyance from the proprietary, out of which the flats were reserved, but afterwards claiming the flats under an office right of dubious validity, and making a settlement of the land on the river on certain of his children together with the flats, and afterwards confirming such settlement by his will, shall be considered as intending to pass the flats to such children, in preference to his residuary devisees under a general clause in his will.

ERROR to the District Court for the city and county of *Philadelphia,* where a verdict and judgment were rendered for the defendant below.

Trespass *quare clausum fregit* brought by Robert E. Jones against Oliver S. Janney. The *locus in quo* was a strip of flats on the river Delaware in Moyamensing in front of land, part of Greenwich island, owned by the defendant. The acts constituting the trespass were proved and admitted, and the question was on the title.

Both parties claimed under William Jones. The plaintiff, Robert E. Jones, was his son; the defendant was his grandchild by Mary Jones, who married —— Janney. The title of William Jones was as follows: By deed dated 20th October 1758, Thomas and Richard Penn, proprietaries of Pennsylvania, appointed Richard Peters and Richard Hockley their attorneys to enter into agreements and contract with any person for the sale and conveyance of the fee-simple and inheritance of the whole or any part of all and every our marsh lands or cripple or swamp grounds situate, lying and being on or near to the —— of Delaware river, and in the townships of Moyamensing and Passyunk or one of them, in the county of Philadelphia, containing in the whole by estimation 600 acres,—and to execute deeds, &c. at not less than ten pounds Pennsylvania currency per acre.

In pursuance of these powers, Richard Peters and Richard Hockley on the 28th February 1759, contracted with William

[Jones v. Janney.]

Jones and Edward Croston, in consideration of £2000 sterling paid and money to be paid, to convey to them in fee as tenants in common all the vacant and unimproved marsh, cripple and swamp situate below the Greenwich Point ferry-house, &c., bounded by the river Delaware to the south-east, by Joseph Lowndes's marsh to the south-west, by Hay Creek and the improved meadows of Edward Shippen, Esq. and Company to the north-west, and by the marsh or meadows of Stephen Pascal and Andrew Bankson to the north-east, computed to be 600 acres or thereabouts. It was covenanted that the premises should be surveyed by the Surveyor-General, Mr C. Scull, and all the marsh, swamp and cripple, it was practicable to bank in and improve, should be included in the survey. "And further, that all the flats which shall be left out of the survey and intended outline banks are to remain the sole property of the said Thomas and Richard Penn and their heirs, and are not intended to be included in the said purchase. But that when the said proprietaries or their heirs shall be inclined to sell and dispose of such flats without the said intended outline banks and survey-aforesaid, the said William Jones and Edward Croston and their heirs and assigns, are to have the preference in the purchase thereof, they paying for the same as much as other persons who may be willing to become purchasers thereof, and in the mean time that full liberty and privilege is and shall be reserved for all the necessary drains, sluices and watercourses that the said William Jones and Edward Croston, their heirs and assigns, shall want to pass and empty themselves through the said flats into the river." On the 24th September 1759, a deed was made for 546¾ acres on the same terms, bounded as follows: "beginning at a corner post on the south side of Hay Creek, being a corner of Stephen Pascal's ground, thence by the said Stephen Pascal's ground and ground of Andrew Bankson south 8 degrees 20 minutes east 234 perches to a cedar post put for a corner, thence by the flats on Delaware river (not included in this survey) the four courses and distances next following, &c.," together with all mines, minerals, quarries, meadows, marshes, savannahs, swamps, cripples, woods, underwoods, timber and trees, ways, (particularly a certain lane) waters, watercourses, liberties, profits, commodities, advantages, hereditaments and appurtenances whatsoever, to the said hereby granted, &c. 546¾ acres of swamp, marsh and cripple, belonging, &c., and also full and free liberty and privilege for all the drains, sluices and watercourses, as before.

On the 10th May 1766, William Jones procured a survey to be made and returned by the Surveyor-General of 50 acres and allowance of cripple and flats in Moyamensing township, situate in front of William Jones's meadows, part of Greenwich island, in pursuance of a warrant bearing date the 27th March 1755, granted to Thomas Preston for 1504 acres in any part of the province purchased of the Indians, being part of the original purchase of

2 M *

George Palmer, deceased; 100 acres part of said 1504 acres, the said Thomas Preston and Sarah his wife, by indenture bearing date the 24th day of November 1755, did grant and convey unto Enoch Elliott of Derby in the county of Chester, and the above-named William Jones then of Kingsess in the county of Philadelphia, in fee as tenants in common.

In 1761 a division took place between William Jones and Edward Croston, by which that part of the tract conveyed to them by the proprietaries which was nearest the river Delaware was assigned to William Jones, and the other part inland to Edward Croston.

On the 15th December 1766, William Jones made a deed of settlement of real estate on his son Mathew Jones, and Mary and Elizabeth Jones his two daughters, conveying it to trustees for their respective uses. Mathew's portion consisted of tracts of land in the township of Kingsessing in the county of Philadelphia, that is to say, 172 acres 86 perches of upland—117 acres of marsh, one boundary of which was " to a stake by the river Schuylkill, thence by the said river"—7 acres of meadow, and one moiety and three-eighths of the other moiety of 5 acres of meadow—4 acres and 16 perches of marsh or meadow, part of which was described as bounded by Land's creek. On Mary and Elizabeth he settled each one half of his tract of 273 acres 60 perches in Moyamensing (being his half of the lands purchased of the proprietaries), described as follows: " All that piece or parcel of marsh or new-made meadow ground situate in Moyamensing township in the said county of Philadelphia, in the district called Greenwich Island, &c., beginning at a post for a corner as well of this and the late Edward Croston's marsh as of the said Stephen Pascal's and Andrew Bankson's meadow ground, thence running by the said Andrew Bankson's south 8 degrees 20 minutes east 107 perches to a post on the edge of the flats on the river Delaware, thence running by and upon the said flats south 70 degrees, west 176 perches, &c." He also settled on Mathew $30\frac{1}{2}$ acres and 55 perches in Moyamensing called Garlick Hall—and also a lot near it containing $3\frac{1}{2}$ acres and 25 perches. The deed in the conveying part to the trustees, after describing all the above, contained this clause, " together with all houses, outhouses, edifices, buildings, woods, underwoods, timber and trees, meadows, marshes, savannahs, swamps, cripples, flats, mines, minerals, ways and waters, watercourses, liberties, easements, privileges, profits, commodities, advantages, hereditaments and appurtenances, to the said premises severally and respectively belonging or in anywise appertaining, &c." To this deed of settlement was added a power of revocation by deed or will.

In 1799 William Jones made his will, in which he confirmed his deed of settlement, and gave to Robert (the plaintiff), born since, a messuage in Southwark, and to Mathew half of 54 acres and 60

perches of meadow in Kingsessing, he paying thereout to Robert £800.  " And whereas I did some years past with my own proper monies, erect, build and finish on a lot of ground, the property of my former deceased wife, a large three-story brick house, situate on the south side of High street, between Fifth and Sixth streets from the Delaware, and nearly adjoining the house I live in; and whereas since the death of my said wife, her two sons William and Joseph Gray have by their deed conveyed to my said son Robert the above-described lot—now I do give and devise the said three-story brick house, together with all the rest, residue and remainder of my real estate, whatsoever or wheresoever, to him my said son Robert, his heirs and assigns, for ever." He further gave £1000 to William, son of Robert, and the rest of his personal estate to Robert. He afterwards declares the share of Elizabeth to be for her separate use; and by a codicil dated November 6, 1802, settles her share in trustees for that purpose. By a further codicil dated November 19, 1802, he annuls the legacy to William of £1000, gives him £500, and £500 between Mary and Elizabeth. The will was proved December 8, 1802.

The court below charged the jury as follows:—

It is conceded by the plaintiff that if William Jones had no title on the 10th May 1766, this suit must fail. It is conceded also that if he had title and legally disposed of it in his lifetime, the suit must fail. Now I assume for all the purposes of settling this controversy, that which both plaintiff and defendant say is true, to wit, that on the 10th May 1766, William Jones *had* title. If he had any doubt about his title, independent of the survey of the 10th May 1766, he seems to have considered that such survey removed the difficulty. What the parties say now for him, he may be presumed to have asserted for himself at that time. With this title, then, and his knowledge of it, he, on the 15th December 1766, makes a deed of settlement on some of his children. He owned the fast land or meadow clearly by virtue of his deed of 24th September 1759. He owned the flats in front of that meadow. The flats, but for the reservation in the deed of the 24th September 1759, would have passed with the meadow. He was, as both parties now before us assert, free from the effect of that reservation, and his title went to low-water mark. Now the point of the case is reached: by a conveyance of the meadow running to the bank, which bank was the high-water mark, the flats and everything to low-water mark would pass also.

But even if this were not clear, a conveyance of the meadow land, together with the flats belonging or in anywise appertaining thereto, would indubitably carry the flats in question. The suggestion that such a conveyance must be limited by the metes and bounds of the meadow land, as they alone are set out in the deed, is to strike out the word ' flats' altogether, and the clause of which it is a part. From the character of this property, a conveyance

of the meadow by metes and bounds together with the flats to said meadow belonging, the said meadow being bounded by a bank; the bank being the dividing line between the meadow and the Delaware river; the flats, too, belonging, without dispute, to the owner of the meadow, no matter whether by the same title or another title — such a conveyance would clearly carry the flats. Then the application of this principle is clear.

[The Judge then read parts of deed of trust, particularly the statement of the parties—the description of the meadow land, as copied from the deed of the 24th September 1759, and the following clause:

" Together with all houses, outhouses, edifices, buildings, woods, underwoods, timber and trees, meadows; marshes, savannahs, swamps, cripples, flats, mines, minerals, ways and waters, water-courses, liberties, easements, privileges, profits, commodities, advantages, hereditaments and appurtenances to the said premises severally and respectively belonging, or in anywise appertaining, and the reversions and reversionary rents, issues, and profits thereof and of every part thereof," and then proceeded]—

The result is, that the title to the flats passed by the deed; and the defendant is entitled on this ground to a verdict.

But I have said that this is deciding the case according to William Jones's declared understanding of his own rights, and is executing the purposes of his last will and testament. By the deed of settlement he spoke of the flats; and he could hardly be supposed to be under the impression that by some legal construction of his deed, the flats which he said should pass, would not pass. He seems to have lived and died in the belief that the flats passed according to his language expressed in a formal deed. By his will made in 1799, upwards of thirty years after the deed of settlement, he refers to that deed and establishes, ratifies and confirms it. By this reference and ratification, he again recognises the right of such of his family as held this meadow to the flats also. He disposes of sundry pieces of real estate not embraced in the deed of settlement, giving to his son Robert, the present plaintiff, a house and lot in Front street between Shippen and Almond streets; confirms his right to a house built by the testator on a lot of the plaintiff's mother, the title to which lot had vested in the plaintiff; and then devises to him in fee all the residue of his real estate. Now it seems to me, that to hold that the flats now in dispute are a part of the residuary estate of William Jones, would be to violate his own very carefully expressed disposition of his property as solemnly and deliberately ratified by his last will.

It is hardly necessary to add anything on the subject of the plaintiff's possession. It is not pretended that he had actual possession further than was held by him while he was erecting the shed, and while the shed remained as the alleged representative of his possession. Before 1840, he does not assert any possession

except that which follows the right: as he had not the right, of course he had not the possession. The suit must then fail on this ground also.

As to the defendant's possession of the flats, it is as complete in a legal sense as his possession of the meadow land. The possession of the flats has gone with the possession of the meadow ever since the deed of 1766; whether it did also before that time it is useless to inquire.

The plaintiff excepted to the charge.

Errors assigned:

1. The court erred in stating to the jury, that by a conveyance of the meadow running to the bank, which bank was high-water mark, the flats and everything to low-water mark would pass also.

2. And also; but even if this was not clear, a conveyance of the meadow land, together with the flats belonging or in anywise appertaining thereto, would undoubtedly carry the flats in question.

3. In stating that the suggestion that such a conveyance must be limited by the metes and bounds of the meadow land, as they alone are set out in the deed, is to strike out the word 'flats' altogether and the clause of which it is a part.

4. In stating, that from the character of this property, a conveyance of the meadow by metes and bounds with the flats to the said meadow belonging, the said meadow being bounded by a bank—the bank being the dividing line between the meadow and the Delaware river; the flats too, belonging without dispute to the owner of the meadow, no matter whether by the same title—such a conveyance would clearly carry the flats.

5. The court erred in the construction given to the deeds read in evidence, and to the deed of trust so called, and in charging that the title to the flats passed by the deed and that the defendant is entitled on this ground to a verdict.

6. In stating that the foregoing opinion is deciding the case according to William Jones's declared understanding of his own rights, and is executing the purposes of his last will and testament.

7. In stating that William Jones seems to have lived and died in the belief that the flats passed according to his language expressed in a formal deed.

8. In stating that William Jones by his will again recognised the right of such of his family as held his meadow, to the flats also.

9. In charging the jury that the flats in dispute were not a part of the residuary estate of William Jones, and did not pass to the plaintiff under the will.

10. In not answering the plaintiff's points.

*Todd,* for the plaintiff in error, referred to *Freytag* v. *Powell,* (1 *Whart.* 536); *Pickering* v. *Stapler,* (5 *Serg. & Rawle* 107); *Blaine* v. *Chambers,* (1 *Ib.* 169); *Hill* v. *West,* (4 *Yeates* 154); 15

Johns. 447; 1 *Sumner* 37; 11 *Pick*. 193; 10 *Peters* 25, 54; *Union Burial Ground* v. *Robinson*, (5 *Whart.* 18).

*Hirst* and *Meredith*, contra, cited *Ball* v. *Slack*, (2 *Whart.* 540); 3 *Kent's Com.* 349; *Hart* v. *Hill*, (1 *Whart.* 131); *Klingensmith* v. *Ground*, (5 *Watts* 459); *Carson* v. *Blazer*, (2 *Binn.* 475); *Commonwealth* v. *Fisher*, (1 *P. R.* 467); *Ueberoth* v. *Lehigh Navigation Co.*, (7 *Haz. Reg.* 293).

The opinion of the Court was delivered by

SERGEANT, J.— It is rightly conceded by the counsel for the plaintiff, that he has no title, if it appears to have been the design of William Jones to embrace the flats in question by his deed of settlement of the 15th December 1766. That such was his design we think fairly inferrible from the language used in the deed, as well as from the circumstances attending the acquisition of his title and the nature of the property. This deed conveys the meadow ground, together with, among other things, all *flats* appurtenant to it: and unless this word be applied to the flats in question, it has no meaning or operation, it being admitted that in the only other properties lying on water, the words " to a stake by the river Schuylkill, thence by said river," and " to a creek called Lands creek, thence south, &c., by the said creek," carry the flats in front of them without any addition. Besides, it is observable that in the deed to William Jones from which the description of this property was taken, the word " flats" was properly omitted, being expressly reserved and excluded by the grantors, and it would not be inserted in the next following deed without a reason. Where words inserted in a deed may have a reasonable application to the subject in controversy, they ought not to be considered as merely expletives thrown in to fill up the parchment and give employment to a scrivener. The words commonly used in our conveyancing, though they may not in every case be necessary, are not on that account to be deemed superfluous; nor will a prudent grantee lightly dispense with them, since their use may turn out to be important. In the present instance I am inclined to think the word "flats" in the clause was inserted with especial reference to the property in question. For it appears that although William Jones was unable to succeed in having the flats included in his contract and deed with the proprietaries, and, for some reason or other unknown to us, their agents carefully excluded them and conveyed only the marsh bounding on the edge of the flats, yet Jones made it a part of his bargain with them that he should have the pre-emption right to the flats. Of course the proprietaries were bound, if ever they concluded to sell the flats to any one, to offer them to Jones, and Jones had an equitable title and could compel them to convey in such case on tender of as much as another person would give for

[Jones v. Janney.]

them, and without this right it is not likely the grantees would have paid so much for the meadow. So that when Jones got his deed of the 24th September 1759 from the proprietary agents, he had a legal title to the marsh, and an equitable pre-emption right to the flats in front, and might thus even then conceive himself in some sort the owner of both as one property. And it was manifestly with the view of completing this object that he obtained an old right, and had it applied to these flats opposite to his ground. The character of this kind of property is such that land bordering on the flats and the flats naturally go together. Their most beneficial enjoyment is derived from their connection; and it is inconceivable that any man in his sober senses having or supposing he had a title to both would intentionally separate them and convey the meadow to one of his children and the flats in front of it to another. For this reason it is that an express exception is required in the grant, or some clear and unequivocal declaration or certain immemorial usage to limit the title of the owner in such cases to the edge of the river. 3 *Kent's Com.* 427. Though the agents of the Penns reserved the flats in their grant, perhaps from too rigid a construction of their powers, which were to convey the " marsh-lands, cripple or swamp grounds," yet there is no instance known in which the proprietaries granted the front of the river to one person and the flats adjacent to it to another : nor is it easy to see that they could have gotten a price for them under such circumstances, whilst the value of the other part would have been necessarily diminished. Flats have always been deemed an appurtenance to the adjoining river front; they pass with it as appurtenances if not expressly excluded : they are a peculiar kind of right, situate in the bed of a navigable river, where the tide flows and reflows, covered by the water at high tide, and left bare at low. While covered with water they are a part of the river, in which the public have the right of navigation, fishing, passing and repassing, and in many instances are not capable of being reclaimed, except by wharves or piers, regulated according to the will of the State in whom the right of the river bed is vested. Under these circumstances, it is fair to presume that William Jones, from the 10th May 1766, when he had the flats surveyed and claimed title to them, (the validity of which, under his warrant to a first purchaser, it is not necessary here to inquire into, since both parties claim under it,) to the deed of settlement of the 15th December 1766, and during the remainder of his life till 1799, when he made his will, considered it as all one property, held as other properties similarly situated on the river were, in the manner best adapted to its beneficial enjoyment, and could not have designed, while he confirmed the settlement, to cut off these narrow flats and pass them under a general residuary clause as a distinct property in favour of another. We are of opinion, therefore, that by the true construction of the conveyances it was the

intention of William Jones to pass these flats by the deed of settlement of December 1766, as an appurtenance to the meadow ground settled on his two daughters, and that there are words in it sufficient and proper to convey them.

Judgment affirmed.