# Penny Pot Landing; or, Com'th ex rel. Northern Liberties *versus* The City of Philadelphia.

1. In 1690, Vine street, from Front street to the river Delaware, in the city of Philadelphia, was dedicated to public use, as a street of the increased width of 100 feet or more, by the act of the commissioners of property.

2. The proprietary, having granted this addition to Vine street for the public use and accommodation, could not revoke the grant by any subsequent act or deed. The rights of the adjacent lot-holders, as well as the public, to Vine street so enlarged, were vested rights, of which they could not be divested.

3. In addition to the right of the city of Philadelphia to the space annexed to and made part of Vine street in 1690, the same piece of ground was expressly granted to the city corporation by the charter of 1701, as Penny Pot landing.

4. Maps, ancient surveys, as well as reputation, are evidence to elucidate and ascertain a boundary, but not to impeach official grants on public record, control having been long exercised in conformity to the grants.

5. The dedication of a street or landing will be intended to be for the public, and not for part of the public in exclusion of any other part.

6. Street, in a town or city, signifies a public highway. No particular form or ceremony is necessary in the dedication of land to public uses.

7. Possession and use will not give an individual or a corporation a title to a franchise which is an encroachment on a public right.

This was a *quo warranto* to test the right of the city of Philadelphia to the franchise of taking toll and wharfage at the Penny Pot landing, alleged by the relators to be within the district of the Northern Liberties. This landing is an open space of ground on the east side of Front street, adjoining Vine street to the northward, containing 57 feet in breadth, and extending eastward to the river Delaware. It was alleged by the city to be a part of Vine street, which they aver is here 107 feet wide.

Two issues of facts were raised by the pleadings: 1. Is Penny Pot landing within the corporate limits of the city of Philadelphia? 2. Does the city charter of 1701 and the act of 11th March 1789 vest this landing in the respondents as their corporate property?

On the trial, at *Nisi Prius*, before COULTER, J., it was shown, on the part of the respondents, that William Penn, in 1683, laid out the town of Philadelphia, and established Vine street, of the width

of 50 feet, as its northern boundary. That on the 8th of 6th month 1689, there was surveyed to James West a lot of ground in the proprietary's lot, at the north side of Philadelphia, containing in breadth 60 feet, and in length 150 feet, bounded southward with a vacant lot, (said to be where the Penny Pot house stood,) eastward with Delaware River, northward with a vacant lot, and westward with a street. For this lot a patent was issued on the 30th of 6th month 1689. That on the 8th of 1st month 1689–90, James West presented a petition to the commissioners of property, "requesting 40 feet of the bank where the Penny Pot house stands, as an addition to 60 feet formerly laid out to him, he having bought the Penny Pot house of the widow." His request was granted, he complying with his promise, "to make a convenient slip with timber, and fill it up with earth, and pitch it with stone against the street, *which is to be left* 100 *feet wide.*" Accordingly, on the 24th of 1st month 1690, there was surveyed to him a lot of ground (including the lot of 60 feet granted to him on the 1st of 6th month 1689) containing in the whole breadth 100 feet and in length 250 feet, bounded northward with William Rakestraw's lot, eastward with the river Delaware, *southward with Vine street,* and to the westward with Front street. On the same day, eighteen other lots, extending northward along Front street, were surveyed to other persons, by virtue of the same warrant, and a survey of the same was returned into the secretary's office, wherein Vine street is laid down of the width of 120 feet east of Front street. On the 19th of 6th month 1690, the commissioners of property granted to James West a patent for the lot last surveyed to him, reserving thereout, during the term of fifty-one years, unto William Penn, his heirs and successors, the rent of ten English silver shillings; and at the expiration of the said term, the yearly value of the premises with the improvements thereon, to be valued and appraised, one-third of which valuation the said James West, his heirs and assigns, should thereafter pay unto the said William Penn, his heirs and successors; to be holden of the said William Penn, his heirs and successors, as of his manor of Springettsbury, in free and common socage, by fealty only, in lieu of other services. On the 25th of October 1701, William Penn erected the town of Philadelphia into a city, and by his charter established the boundaries thereof as the town was then laid out between Delaware and Schuylkill, and granted and ordained that the streets of the said city should for ever continue as they were then laid out and regulated, and that the end of each street extending into the river Delaware should be and continue free, for the use and service of the said city and the inhabitants thereof; and that the landing-places then and theretofore used at Penny Pot house and Blue Anchor should be left open and common for the use and service of the said city and all others. That on the 4th of July 1776, the said cor-

poration was dissolved, and by several acts of Assembly, passed between that date and 1789, its powers and duties were devolved upon the wardens of the city of Philadelphia, and upon commissioners for paving the streets, &c. The former body were, among other things, directed to let or demise the wharves and public landing-places in the city, and to appropriate the proceeds to watching and lighting the streets, &c. By act of 11th of March 1789, the present city corporation was erected, and all the rights of the late corporation in all wharves, landings, landing-places, &c. were vested in the corporation thereby created. And by the act of 2d April 1790, they were invested with all the powers of the wardens of the city. Since 1789, the landing has been used as a wood-wharf, and has been leased for that purpose by the respondents.

On the part of the Commonwealth it was shown that the northern boundary of Philadelphia, as originally laid out, was the north side of Vine street, of the width of 50 feet, extending in a direct line from Delaware to Schuylkill. And to show that there had been a charter of incorporation of the town of Philadelphia, as a borough, prior to the alleged widening of Vine street on the Delaware, and that the city of Philadelphia was incorporated with the same boundaries as the more ancient corporation, there were given in evidence the proceedings at a council held at Philadelphia, on the 26th of 5th month 1684, (present, William Penn, proprietor and governor, William Welsh, and others,) at which Thomas Lloyd, Thomas Holmes, and William Haigue were appointed to draw up a charter for Philadelphia, to be made a borough, consisting of a mayor and six aldermen, and to call to their assistance any of the council: Also, the petition of the inhabitants of Philadelphia, to the governor and council, in 1691, praying that the landing-place at the end of the street, near the Blue Anchor, might be regulated, &c.; signed by Humphrey Murrey, mayor, and others: The proceedings at the meeting of the governor and council on the 3d of 6th month 1691, at which it was ordered that, "in consequence of the application of the mayor, Humphrey Murrey, in behalf of the said city," praying, &c., that the said *mayor and aldermen* have notice to attend and view the same: Also, a protest on the 19th of 11th month 1691, by the commissioners of property, against these proceedings by the governor, Humphrey Murrey, mayor, and others: Also, the charter of 1701, whereby William Penn recites that "I *have*, by virtue of the king's letters patent, erected the said town into a borough; and by these presents *do* erect the said town and borough of Philadelphia into a city." By various ancient plans and surveys it appears that Vine street, up to the period of the revolution, was recognised as extending of an uniform width from Delaware to Schuylkill, and the landing in question was marked as "The Slip." At the expiration of the term mentioned in James West's patent, it was shown that his son,

[Penny Pot Landing; or, Com. ex rel. Nor. Liberties *v.* City of Philadelphia.]

Charles West, requested that the premises might be resurveyed, and that the proprietaries would release the third part of the yearly value, and accept in lieu thereof a rent-charge of fifteen pounds sterling. Accordingly, on the 30th of March 1747, the premises were resurveyed by William Parsons, surveyor-general, and found to be situate on the bank of Delaware River, *at the distance of 57 feet northward from Vine street, and bounded northward by the public landing-place, commonly called the Penny Pot landing.* On this resurvey a patent was issued to Charles West, on the 14th of May 1747, reserving an annual rent-charge of £15; and describing the premises as in the return of resurvey. By the act of 17th April 1795, the regulators of the Northern Liberties were directed to survey and regulate the streets thereof, to make correct drafts of the same, and to return the same, under their hands, to three justices of the peace, who should keep the same for public inspection for three months, after which the said justices, together with six resident freeholders, by them appointed, should give two weeks public notice that on a certain day they would examine the said drafts, and hear the objections of any persons thereby aggrieved; and that the justices and freeholders should have power to determine whether the same shall be finally established, or whether any or what alterations should be made therein; and should direct the same, with their adjudication thereon, and every necessary explanation, to be recorded in the office of the clerk of the Court of Quarter Sessions of Philadelphia county. On the plan of the first division of the Northern Liberties filed in the office of the clerk of the Court of Quarter Sessions in pursuance of this act, Vine street is laid down of the uniform width of 50 feet to the Delaware, and immediately north of it is the "public landing," of the width of 57 feet. The act of 4th April 1796 provided that the commissioners of the county of Philadelphia, in whom the public landings on the river Delaware, in the township of the Northern Liberties, were by law vested for the use of the public, might, with the approbation of three justices of the county, make rules for the government thereof, prescribe the rates of toll, and lease the same for any term not exceeding three years. And by the act of incorporation of the Northern Liberties, on the 16th March 1819, all landings, &c. held for the use of the inhabitants of the said district were vested in the corporation thereby created, and they were prohibited from altering the lines of any street which had been surveyed, regulated, and established under the act of 1795. It was also shown that in 1835 the city authorities reset the curbstone on the north side of the landing according to the city regulation, whereupon the commissioners of the Northern Liberties directed their superintendent to reset the same in accordance with the district regulations, which was done accordingly, and has so remained.

[Penny Pot Landing; or, Com. ex. rel. Nor. Liberties *v.* City of Philadelphia.]

COULTER, J., charged the jury that, by the charter of 1701, this landing, and the control thereof, were granted to the city corporation; that they had shown a lawful right to take toll at and to control the same; that the time elapsed was presumptive evidence of a grant from the Penns, and there was no evidence to the contrary; that the Penns having dedicated this landing to public use, subsequent surveys could not show that the city had not the right; that the act of 1819 did not vest the same in the district of the Northern Liberties; and that the fact that the district authorities entered and reset the curbstone in 1835 was a matter of small importance.

There was a verdict for the respondents; whereupon the relators' counsel moved for a new trial, and assigned as reasons for the same that the learned judge erred in charging the jury as above mentioned.

*Brightly*, for relator.—The City having in their pleadings relied on a title by prescription, could not set up another on the trial: *Chester Case* 548, 410–11; 1 *Burr.* 294: 4 *Burr.* 2143; *Cowp.* 505–7; *Will. Corp.* 2, sec. 486; 15 *Johns.* 358; 1 *Pike* 513; 3 *Pike* 570; *Moore* 297; 1 *Green. Ev.* sec. 58. No length of time will raise a presumption of right in favor of encroachments on the public; in such case the presumption is the contrary way: *Math. Pr. Ev.* 15; 1 *Green. Ev.* sec. 10; 4 *Burr.* 2164; 1 *Whar.* 469, 486; *Chester Case* 24, 44, 64; 2 *Watts* 23; 16 *Ser. & R.* 395; 3 *Penn. R.* 259; 7 *Pa. L. J.* 86; 1 *Jones* 447. And where admitted, the presumption only arises where the use or occupation would otherwise be unlawful: *Math. Pr. Ev.* 14, 15. Until the incorporation of the local authorities, the control of the city was not adverse: 1 *Whar.* 485; 6 *Peters* 439; 10 *Peters* 662, 712; 1 *Jones* 447. But there was abundant evidence to rebut any such presumption: 16 *Ser. & R.* 395; 1 *W. C. C.* 214. William Penn made a clear distinction between the rights of the city corporation to the ends of the streets and to the public landings. The ends of the streets are to continue free, for the use and service of the said city and inhabitants thereof; whilst the public landings are to be left open and common for the use and service of the said city and *all others.* Unless, then, this landing be a portion of the end of Vine street, and consequently within the corporate limits of the city, the respondents were not entitled to a verdict. Neither the charter of 1701 nor the act of 1789 mention the boundaries of the city: it is the town and borough of Philadelphia which is incorporated, as it is now laid out between the Delaware and Schuylkill. It is admitted in respondent's answer, that William Penn, in 1683, laid out the town of Philadelphia, and established Vine street, of the width of 50 feet, as its northern boundary; the

[Penny Pot Landing; or, Com. ex. rel. Nor. Liberties *v.* City of Philadelphia.]

landing was clearly excluded from this limit. In 1684, a committee was appointed to draw up a charter for Philadelphia to be made a borough, consisting of a mayor and six aldermen, 1 *Col. Rec.* 64; and although this borough charter is not now extant, there can be no doubt of its former existence, since, in 1691, we find Humphrey Murrey acting as mayor of Philadelphia, and recognised as such by the governor and council, and also by the commissioners of property. We also find by the document establishing this fact, that there were then aldermen of Philadelphia, as provided in the proposed charter : 1 *Watson's Annals* 336. And in the charter of 1701, William Penn recites that he *had* erected the said town into a borough, and did thereby erect the said town and borough into a city : 1 *Dal. Laws*, ap. 11. This is presumptive proof of the former existence of a borough charter : 1 *Spencer* 61. It was then the ancient borough, incorporated in 1684, which was erected into a city in 1701, and with the same boundaries, excluding the *locus in quo ; Reed's Explanation* 13 ; 1 *Whar.* 484. And if Vine street was widened in 1690, it by no means follows that the additional width was thereby thrown within the limits of the borough. It is true, the ancient plans, surveys, and documents given in evidence, cannot divest the right of the city ; but they were strong evidence to rebut the presumption of a grant : 1 *Green. Ev.* sec. 129, 135, 138, 139, 145 ; 11 *Ser. & R.* 149 ; 6 *Bin.* 59 ; 2 *Ser. & R.* 50 ; 1 *Peters C. C.* 496 ; 2 *Litt.* 159 ; 3 *Rand.* 44. It is said the right to exact tolls may, on evidence of long and *undisputed* enjoyment, be presumed to have originated in a grant : *Calthrop* 122 ; but the antiquity of the usage must be very great, as, in the only cases on the subject, the tolls claimed had been received for centuries : *Math. Pr. Ev.* 303 ; 1 *Show.* 47 ; *Cowp.* 102 ; 6 *Cowen* 706 ; 10 *Shep.* 339. The whole difficulty, however, in this case was satisfactorily explained by the resurvey of West's lot, in 1747, when it was found to be 57 feet north of Vine street. The documents fixing the southern boundary of the Northern Liberties are also full of persuasive evidence to rebut all idea of this landing being within the city limits : 2 *Smith* 106 *; Serg. Land Laws* 196, 224 ; *Gordon's Hist.* 78 ; 1 *Whar.* 412. The original survey of the Liberty lands has been lost for many years, 4 *Yeates* 144 ; the courses and distances, however, are given in *Reed's Exp.* 15. Out of these Liberty lands the manor of Springettsbury was laid out : 1 *W. C. C.* 262, the record of which is also lost ; but on the 12th of 8th month 1703, a warrant was issued to resurvey the manor, and a copy of an ancient plan, believed to be a return to this warrant, was given in evidence, on which the southern boundary of the manor is laid down as a direct line from river to river. The counsel also cited *Minutes of Common Council*, 17, 28, 498 ; 2 *Col. Rec.* 542, 563, 566, 587, 588 ; 3 *Col. Rec.* 618 ; 1 *Smith* 412 ; *id.* 318 ; 2 *Smith* 49 ; 3 *Smith* 224 ; 7 *Smith* 61 ; *id.* 177 ;

[Penny Pot Landing; or, Com. ex rel. Nor. Liberties *v.* City of Philadelphia.]

6 *Ser. & R.* 522 ; 3 *Smith* 274 ; 1 *Whar.* 46.   He also contended, that the presumption of a grant arising from long-continued, uninterrupted enjoyment, is a presumption of *fact* to be drawn by the jury, *Math. Pr. Ev.* 3, 4 ; 1 *Green. Ev.* sec. 44–48, and not as here, by the *court.*

*Olmsted,* for the respondents.—The respondents did not endeavour to make out a title by prescription : they proved a *grant* of the right to tolls for the use of the landing.   The respondents claim the right by the grant, in the charter of 1701, of the ends of the streets on the river Delaware, and of Penny Pot landing, by that name ; that is to say, they claim to take such toll because the *locus in quo* is either the end of Vine street, or because it is Penny Pot landing.   The application of James West, in 1689, for an addition to his lot on the river Delaware, was granted by the commissioners of property, on his engagement to make a convenient slip, with timber, and fill it up with earth, and pitch it with stones against the street, " *which is to be left* 100 *feet wide.*"   Here is the act of the proprietary officers to secure this landing for the use of the public; it is thrown into the street, which is increased in width by this addition to 100 feet.   The return of survey bounds the lot on the south by Vine street; the plan shows it so bounded, and also the patent.   Then follows the address of the inhabitants of Philadelphia, through the intervention of the Assembly, that the ends of the streets be unlimited, and be left free to be extended in the river, and that the public landing-places at the Blue Anchor and Penny Pot house be confirmed free to the inhabitants.   To which the proprietary answered :  " About the ends of the streets and other public landings of this town, I am willing to grant the ends of the streets, when and where improved, and the other according to your request." 1 *Votes of Assembly,* 145, 148.   Accordingly, a charter was granted to the city on the 25th October 1701, wherein it is ordained that the said city " shall extend the limits and bounds as it is laid out between the Delaware and Schuylkill," and that the " end of each street extending into the river Delaware shall be and continue free for the use and service of the said city and the inhabitants thereof."   The streets, as there laid out and regulated, were to continue for ever ; one of these was Vine street, as increased in width by the addition of Penny Pot landing.   The fact of the former existence of a borough charter may be questioned : it is not now extant, and if it did exist, there is no reason to conclude that only those streets which were in existence during the time of the borough were to be provided for in the city charter.

But admitting that Penny Pot landing was not incorporated into Vine street at the date of the charter, but existed distinct from the street, as a public landing, then it was granted to the corporation

H

[Penny Pot Landing; or, Com. ex rel. Nor. Liberties *v.* City of Philadelphia.]

as Penny Pot landing by the charter : 1 *Whar.* 479, 484.   The dedication of the street once made was irrevocable : 1 *Whar.* 469. No act of the proprietary or his officers could change it.   The opinions of annalists and surveyors cannot counteract the positive act of the proprietary and his officers; but they made no effort to ascertain the true width of Vine street, nor was it necessary for them to do so.   The respondents are not concluded by the acts of the regulators of the Northern Liberties, under the act of 1795. Their authority only extended to the regulation of the streets laid out in the Northern Liberties, *beginning at the northern bounds of the city of Philadelphia, on the river Delaware :* 3 *Smith* 224. The Penny Pot landing was not acquired by the application of public moneys, as was the case of the other landings granted to the corporation of the Northern Liberties by their charter, (1 *Whar.* 46;) it was the private property of the proprietary and by him granted to the respondents for the use of the public.

The opinion of the court was delivered by

CHAMBERS, J.—The corporation of the city of Philadelphia are called upon, by writ of *quo warranto,* issued by this court, to show by what right they exercise the franchise of taking toll and wharfage at a place called the Penny Pot landing, which is alleged by the relators to be within the district of the Northern Liberties. This landing is a space of ground on the Delaware river, and part of or adjoining Vine street, and which is claimed by the city as within her corporate limits.   For the exercise of the franchise claimed by the city of taking toll and wharfage, it is incumbent on the city to show that she had and still possesses this right.

The case was tried at *Nisi Prius* before Justice COULTER, and on the merits, without regard to the pleadings, leaving the single and important question of right to be decided on the law and evidence by the court and jury.   Being brought before this court, on a motion for a new trial, the whole case is presented for the revision and judgment of this court on the evidence and the charge of Judge COULTER to the jury.

The consideration of this case imposes on the court an inquiry into the early history of the location and plan of the city of Philadelphia by its eminent founder.   For its elucidation, the court is indebted to the research and ability of the able counsel who have prepared the case and argued it for the parties.   Penny Pot landing and that of the Blue Anchor were places of notoriety and importance when Philadelphia was first made a town and afterwards a city ; the one being a landing at the foot of Vine street, and the other at the foot of Dock street, being for a long time the only places of landing on the Delaware for those who carried on trade, commerce, or intercourse with the city on the Delaware side.   The high bank from Front street to the river presented, between Vine

and Dock streets, an obstacle to intercourse with the city, except at these openings and landings, which were deemed indispensable for access to the city, and were used as such. The importance of these landings, at that early day, would not be overlooked by the proprietary, the officers of his government, or the inhabitants or authorities of the city. On the part of the city it is alleged that her right to the occupancy of this piece of land, called Penny Pot landing, as a public street and landing, is by grant from the proprietary, and confirmed by his official agents to the inhabitants of the town of Philadelphia, within a few years after laying out the town, and before a charter had been granted them for a city. It is also alleged that the right of the city to the use and control of this piece of ground, either as a part of Vine street, or as Penny Pot landing, was further confirmed by the charter to the city from the proprietary. The control of the city is derived first by grant of this piece of ground known as the Penny Pot landing, by its being made a part of Vine street, by the proprietary, not as a transfer to the city of the absolute property in the soil, but as an appropriation and dedication of it for the public use as part of a street.

Vine street, as first laid out in the town plan of Philadelphia by William Penn, was but fifty feet wide, extending from the Delaware to the Schuylkill; but as he was the absolute owner of the landing and lands adjacent, not appropriated, it was competent to him to grant them and dispose of them, or any franchises and easements appurtenant to them, to whom he pleased, and on such terms and with such privileges and uses as he might deem proper.

In considering the evidence of a grant to the city, in this case of the public franchise and use claimed, reference must be had to the usages of the proprietary government, at that early period of its history, in the form and method of granting and appropriating the lands of the proprietary in his province. Whatever system of conveyance and grant was established, it was brief and informal, and was so much in the breast and will of the proprietary, that forms of grant and agreement were variable, according to the pleasure of the proprietary, the change of officers, or the expediency of the times.

It is in evidence from the books of the land-office, that by virtue of a warrant from the commissioners of property, dated 1st of 6th month 1689, there was surveyed, the 8th of same month, unto James West, shipwright, a certain lot of ground on the proprietary's lot, at the north side of Philadelphia, containing in breadth 60 feet, and in length 150 feet, bounded to the southward by a vacant lot, eastward by the Delaware river, northward by a vacant lot, and to the westward by a street.

This would appear to be the first appropriation by the proprietary at the north side of Philadelphia, and was either adjacent to

[Penny Pot Landing; or, Com. ex rel. Nor. Liberties *v.* City of Philadelphia.]

or in the vicinity of Penny Pot landing, being on Front street and the Delaware river. On the same day there was made for James West another survey of a lot at the same place, on the same warrant, being 150 feet by 160, bounded on the Delaware and a street. This last survey appears to have been experimental and not adopted as final; for from the minutes of the commissioners of property, it appears that "at a meeting of the commissioners, 8th of 1st month 1689–90, present, Markham, Turner, Goodson, and Carpenter, James West requesting 40 feet of the bank where the Penny Pot house stands, and in addition to 60 feet formerly laid out to him for a conveniency to build ships and vessels upon, for having bought the Penny Pot house of the widow, his request was granted, he complying with his promise, viz. to make a convenient slip with timber, and fill it up with earth, and pitch it with stones against the street, which is to be left 100 feet wide."

In conformity to this agreement, and under a warrant dated 22d of 1st month, 1690, there was surveyed and laid out on the 24th of the same month, unto James West, a lot of ground in the bank, of the proprietary's land, at the north-east part of Philadelphia, which said lot likewise included a lot of 60 feet, granted unto him by the commissioners, the 1st of 6th month 1689, containing the whole breadth, one hundred feet, and in length two hundred and fifty feet, bounded northward by William Rakestraw's lot, eastward with the river Delaware, of the said extent of 250 feet, southward with Vine street, and to the westward with Front street; which survey is entered in the surveyor-general's office.

On the day of this last survey, there were surveyed by the surveyor-general, eighteen other lots for other persons named, adjoining in the same vicinity on Front and Vine streets; a plot of which combined, representing their respective locations, and the streets on which they are bounded, is returned into the secretary's office on the next day, and there recorded and preserved. In that plot of the proprietary's appropriations or grants of lots, is the lot of James West, with its boundaries, as agreed by the commissioners, bounding it on "*Vine street,* 120 *feet broad,*" from Front street to the Delaware, and describing Vine street as 60 feet broad west of Front street. And on the 19th of 6th month 1690, a patent issued from the commissioners of property, to James West, for his enlarged lot as described. It is to be observed in the agreement between West and the commissioners of property, his lot was to include part of the Penny Pot house landing, and to bound on the street which was to be left 100 feet wide. The survey of the proprietary officer, with the plot returned of it and the other lots, describe that part of Vine street adjacent to West's lot, as 120 feet broad.

Here are four official acts of the proper officers of the proprietary government for the granting, bounding, and recording appro-

[Penny Pot Landing; or, Com. ex rel. Nor. Liberties *v.* City of Philadelphia.]

priations of land, in conformity to the then existing regulations and usages of the land-office, and are preserved among the early records of that office, furnishing the highest evidence that Vine street was enlarged to 100 feet or more in width, from Front street to the Delaware; and that as so enlarged, it was, by grant from the proprietary, dedicated to the public use as a *street*, which signifies, in a town or city, a public highway. No particular form or ceremony is necessary in the dedication of land to public use. Cincinnati *v.* White, 6 *Peters's Rep.* 440. But in this dedication of the addition to Vine street by the proprietary, there is all the formality of grant which then characterized grants of land under his provincial government.

This enlargement of Vine street consisted of a part of the Penny Pot landing, adjacent to West's lot, and to which the widened street was appurtenant as a boundary; and as a public highway, it enured not only to his use and the other lot-holders in the vicinity, but to the use of the public. William Penn; having by his agents and accredited officers, granted this addition to Vine street for the public use and accommodation, in 1690, could not revoke that grant by any subsequent act or deed. In the case of Cincinnati *v.* White, 6 *Peters's Rep.* 431, in affirmance of this principle, it was ruled "that after land is set apart for public use, and enjoyed as such, and private and individual rights acquired with reference to it, the law considers it in the nature of an *estoppel in pais*, which precludes the original owner from revoking such dedication."

The rights of the adjacent and neighbouring lot-holders, as well as the public, to Vine street so enlarged, were vested rights, of which they could not be divested by William Penn; and if it were not competent to Penn, the proprietor and founder, to divest or impair his grant and dedication of this extended street, it cannot with any propriety be supposed that this could be done many years after his death, by acts on the part of some of the subordinate officers of the proprietary government. It is due to the high character and eminent integrity of William Penn, to say that, during his life, no act was done by him having any tendency to impair the grant and dedication of this street. It was consistent with the use of Vine street as a public highway, that the landing at the end of that widened street might be used by the public as a landing, under the government of the city authorities.

Every subsequent act by William Penn in relation to it was in confirmation of the previous grant. The Assembly of the province, in their address to the governor, presented on the 20th of 7th month 1701, in the tenth item says: "That the streets of the town be regulated and bounded, and that the ends of the streets on Delaware and Schuylkill be unlimited and left free to be extended on the river, as the inhabitants shall see meet; and that

public landing-places at the Blue Anchor and Penny Pot house be confirmed free to the inhabitants of this town, not infringing any man's property :" 1 *Votes As.* 145 ; 2 *Col. Rec.* 35.    To this, the governor and proprietor replied, on the 29th of same month : " About the ends of streets, and other public landing-places of this town, I am willing to grant the ends of the streets, where and when improved, and the other according to your request :" 1 *Votes As.* 148 ; 2 *Col. Rec.* 39.

The charter of William Penn for the city of Philadelphia, dated 25th October, 1701, erects the said town and borough of Philadelphia into a city, "which said city shall extend the limits and bounds as it is laid out between the Delaware and Schuylkill."

" And I do for me, my heirs and assigns, grant and ordain that the streets of the said city shall for ever continue as they are now laid out and regulated, and that the end of each street extending into the river Delaware shall be and continue free for the use and service of said city and the inhabitants thereof, who may improve the same for the best advantage of the city, and build wharves so far out into the river there, as the mayor, aldermen, and common council, hereinafter mentioned, shall see meet.

" And I do also ordain, that the landing-places now and heretofore used at Penny Pot house and Blue Anchor, saving to all persons their just and legal rights and property in the land, so to be left open, as also the swamp between Budd's buildings and the Society hill, shall be left open and common for the use and service of the said city, and all others, with liberty to dig docks, and make harbors for ships and vessels, in all or any part of said swamp."

The addition to the width of Vine street, as stated, was made by the proprietary in 1690, and then dedicated to the public use as a street ; and in 1701, by the charter from him to the city, it is ordained that *the streets of said city shall for ever continue as they are now laid out and regulated.*    The acts of the proprietary, in his reply to the address of the Assembly, or in the charter granted to the city, were not in any way in derogation of his previous grants and concessions, but in confirmation of the same.    The ends of the streets extending into the river Delaware were to be and continue free ; and the landing-places before used at the Penny Pot house and the Blue Anchor, saving to persons their just rights, &c., were to be left open and common for the use of said city and all others.    The control of the franchises for the public accommodation in the use of the streets and landings was necessarily and explicitly conferred on the authorities of the city.

If the city had not ample authority and control over Vine street as widened under the appropriation and dedication made as a grant from the proprietary, which the court is of opinion it had, it would be entitled to the control of the Penny Pot house landing under the concession of the proprietary to the Assembly, and the

[Penny Pot Landing; or, Com. ex rel. Nor. Liberties *v.* City of Philadelphia.]

express grant in the charter of 1701 to the city of that landing, which was to be left open and common for the use and·service of said city and others, with liberty to dig docks, &c.

The occupancy of this landing and the control of the same by the city have been consistent with these grants as far back as the memory of witnesses will serve, and who testify that Vine street was of the width of 50 feet above Front street, and 107 from Front street to the Delaware.

Subsequent legislation has been in confirmation of the authority and right of the city. By act of 30th May 1780, (1 *Smith* 506,) the wardens of the city were authorized to let or demise the market-houses, ferries, wharves, and public landing-places; the moneys arising thereupon to be applied to the uses specified in the act of 9th March 1771, (1 *Smith* 370,) to wit, for watching and lighting the city, &c.

By the 40th section of act of 11th March 1789, to incorporate the city of Philadelphia, (2 *Smith* 462,) all the rights of the late corporation in all wharves, landings, and landing-places, &c. were vested in the corporation thereby created. By act of 2d April 1790, (2 *Smith* 526,) all the powers of the wardens of the city under former laws were vested in the present corporation.

What is alleged and proved by the relators to impair this right? It is said that, in the opinion of surveyors, map-makers, and historians, Vine street was of one uniform breadth of 50 feet, from the Delaware to the Schuylkill. The most ancient map of Holmes, made in 1683, when the town of Philadelphia was laid out, does so represent it, and rightly at that time; but it is to be observed that this map was made some seven years before the addition to Vine street was made by the proprietary. As it is conceded that Vine street was originally laid out only of the width of 50 feet, Holmes's map is not to be relied on as affording any evidence of any addition to this street as made in 1690. The subsequent maps and plots are but outlines to represent the ground boundaries and configuration of the city, without investigating with legal accuracy the rights of individuals or the public in every part, or defining them with a precision to be relied on. Whether these acts were those of the officers of the proprietary government or other citizens in making a map of the city, they could not divest the right of the city and public to streets and franchises before granted by the proprietary. The city of Philadelphia was not a party·to the forma-·tion of these surveys and maps, and the city as well as the public and the lot-owners interested in the enlargement of Vine street, or in the landing on the river, extended for that width, were not to be prejudiced by them. Maps, ancient surveys, as well as reputation, are evidence to elucidate and ascertain boundary, as well as fix monuments; but in this case they are offered to impeach official grants on public record, and when on the landing control

[Penny Pot Landing; or, Com. ex rel. Nor. Liberties *v.* City of Philadelphia.]

has been exercised and tolls taken by the city authorities from time immemorial, in conformity to the official grants; against such evidence, such plots or surveys ought to have no weight.

The research of the relators' counsel has brought to our notice from the land office, a draft entitled "bank above the town," on which it is entered: James West, in the year 1690, had a patent for a lot 100 feet front, 250 long; bound northward by William Rakestraw, and southward by Vine street, both which cannot be true. There is no date to this entry, and it is presumed that it was made about 1747, the time of the resurvey in evidence, made for Charles West, son of James, and is to be accounted for by the omission to examine minutely the proceedings had in relation to the survey and return of James West's lot in 1689-90. The parties connected with that survey may be supposed to have been deceased, and the facts to explain it were only to be had by diligent search into the transaction, as it had been acted more than fifty years before. The survey and plot on file, and on record, exhibiting the lots and the names of the proprietors, their boundaries, and Vine street as widened in 1690, if seen as they ought to have been, would have relieved those investigating the matter of all doubt and uncertainty. The landing at Penny Pot house was no doubt of more extensive accommodation to the public and its importance in higher estimation to the city whilst it was one of the two great landings and avenues for the trade and intercourse with the growing city. But after Front street was opened, and wharves made at the foot of Market and other streets on the Delaware, and access had to the city from new landings and streets opened, the importance of Penny Pot landing may have declined, and the occasion to use Vine street as a highway would not probably then require more than the fifty feet in width, which would accommodate the public, without subjecting the city to the expense of paving and improving the extended way, which the public accommodation and necessities did not then require. But the extended growth and importance of this city and the Northern Liberties will make the act of the proprietary in widening Vine street from Front street to the river ever to be commended for its propriety, convenience, and utility.

It has been remarked in the argument, that while the proprietary granted that the ends of the streets extending into the river Delaware should be and continue free for the use and service of the said city and the inhabitants thereof, it was provided and granted that the Penny Pot and Blue Anchor landings (saving to all persons their just and legal rights and property in the land so to be left open, as also the swamp between Budd's buildings and Society hill) shall be left open and common for the use and service of said city, and *all others*, with liberty to dig docks and make harbors for ships and vessels in all or any part of the said swamp. We do not

consider the variation in the tenure as expressed by the terms used in the two cases as creating any difference of use.    The use dedicated and transferred is public and indefinite, to be used and enjoyed according to its nature and circumstances, so as to afford to the *public* the accommodation intended.    The dedication of a highway, street, or landing will be intended to be for the public, and not for part of the public in exclusion of any other part.

The city authorities must regulate the use of the street and landing for the accommodation of the inhabitants and strangers having occasion to use the privileges conferred.    The erection and repair of wharves and landings and the improvement of the street would require, on the part of the city, expenditures of money, and it is just and proper that they should exact reasonable tolls or charges from those who found it convenient or advantageous to use the said wharves and landings.    Without such expenditures, improvement, and repairs, they would be inconvenient, if not useless; and that the franchises should be enjoyed by the public, without annoyance or abuse, it is necessary that there should be established regulations for the government of the use.    As it is the interest and policy of the city authorities to facilitate trade and commerce with the city, it is not to be supposed that they would be unreasonable in their exactions, or in their regulations for the common enjoyment of the public.    If there were any such abuse of authority, which is not to be presumed, it might be a proper matter for legislative cognizance, reform, or control.

Vine street, from Front street to the Delaware, has a width from its south line to the boundary of what was James West's lot, and which is exceeding 100 feet.    The variance in the reported width of that street, from Front street to the Delaware, at different early times, might have arisen from inaccuracy in commencing for mensuration at some distant point, or from inequalities of surface of the ground, which may have been variable at different periods.    In 1690, the surveyor-general described it then as 120 feet wide, and now it is represented as 107 feet.

There is nothing to impair the rights of the city in the proceedings of the surveyors and regulators appointed under the act of 1795 to survey and regulate the streets laid out in the township of the Northern Liberties, beginning at the northern bounds of the city of Philadelphia on the river Delaware.    If the northern boundary of the city was on the north side of Vine street 107 feet wide, the regulators were without authority when they attempted to do any act south of it, and neither by their opinion nor acts could take away any of the rights of the city to its franchises on Vine street and the landing on the same; and under the act which provided for paving the streets, there was no act done by the authority of the Northern Liberties in the way of paving and

[Penny Pot Landing; or, Com. ex rel. Nor. Liberties *v.* City of Philadelphia.]

curbing the part of the street now claimed on the part of the Northern Liberties, that could prejudice the rights of the city.

The right of the city to the control and regulation of Vine street and the landing on the Delaware at the foot of it, is, in the opinion of this court, derived from grants by the proprietary, as recited and commented on, and who was the absolute owner thereof. It is not a right depending on presumption or prescription.    Possession and use alone would not give the city a title to the franchise claimed against the public.    "It is well settled that lapse of time furnishes no defence to an encroachment on a public right." "If no grant be shown, presumption will not be made to support a nuisance by encroachment on a public right :" Commonwealth *v.* Alburger, 1 *Whar.* 486–8; and in the Commonwealth *v.* McDonald, 16 *Ser. & R.* 395, Justice DUNCAN says that "public rights cannot be destroyed by long-continued encroachment ;" and in Barter *v.* Commonwealth, 3 *Pa. Rep.* 253, GIBSON, C. J., said, "that the government of every incorporated town has a right to improve the streets for public purposes, is a proposition about which there can be little dispute," and " no private occupancy, for whatever time, and whether adverse or by permission, can vest a title inconsistent with it." "The case of Commonwealth *v.* McDonald, by which this salutary principle has been established, is founded in the purest reason and fortified by the strongest authorities." And in accordance with this principle is the case of Rung *v.* Shoneberger, 2 *Watts* 23.

This opinion has been extended by the review of the many documents given in evidence and the points presented by the counsel ; and in the opinion of the court, the learned judge before whom the cause was tried was warranted by the law and evidence in saying to the jury "that the city of Philadelphia had shown she had a lawful right to take toll and control this landing ;" and as it is the opinion of the court that the mayor, aldermen, and citizens of Philadelphia, in behalf of the city, have shown by grant from the proprietary the right to exercise the franchise of taking toll and wharfage for the use of the piece of land formerly called Penny Pot landing, it is unnecessary to examine the claim of the Northern Liberties to the same franchise, as, if there is an existing right in the city of Philadelphia, which is prior, paramount, and exclusive, there can be no valid right in the incorporated district of the Northern Liberties. The whole case being by the court considered, the court overrule the motion for a new trial, being satisfied with the finding of the jury under Justice COULTER, and direct judgment to be entered for the Mayor, Aldermen, and Citizens of Philadelphia.