### SNOWDEN et al. v. LOREE.

(Circuit Court, W. D. Pennsylvania. September 19, 1902.)

#### No. 15.

**1 PUBLIC LANDS—VALIDITY OF PATENT FROM STATE—LAND PREVIOUSLY DEDICATED AS STREET.**

The state of Pennsylvania laid out a town with outlots, now the city of Allegheny, on a reserved tract along the north shore of the Ohio and Allegheny rivers, under Act Sept. 11, 1787, 2 Smith's Laws, p. 414, which provided that "the streets, lanes and alleys of the said town and outlots shall be common highways forever." By the survey and plan adopted a lane or street was laid out afterwards known as "Bank Lane," extending along the shore, and fronting on certain outlots, which were platted and sold as bounded on the south by the lane. *Held*, that such action of the state, which in laying out the town acted as an individual or private proprietor, was a dedication of the lane to public use, and estopped it to thereafter sell the property, and that a patent issued by the officers of its land department 50 years later, purporting to convey a portion of the land included in such lane to a private purchaser, was without warrant of law and void.

**2. ADVERSE POSSESSION—REQUISITES—TITLE TO SUPPORT EJECTMENT.**
    While it is the established law of Pennsylvania that adverse posses-
sion for the statutory time will give such title as will support an action
of ejectment, it is also the law that nothing short of actual, continued,
visible, notorious, distinct, and hostile possession for 21 years will give
such title; a mere claim of title or ownership of vacant land by an
adjoining owner and the driving away of trespassers is not sufficient.

Action in Ejectment.   Trial to the court by stipulation.

L. C. Barton and C. F. McKenna, for plaintiffs.

Johns McCleave, for defendant.

BUFFINGTON, District Judge.   This is an action of ejectment
brought by Fannie B. Snowden and others against L. F. Loree,
receiver of the Pittsburgh & Western Railway Company, to recover
a rectangular strip of land situate at the southwest corner of Grant
and South avenues, Allegheny City, Pa.   The land is about 160 feet
in width on South avenue, and some 940 odd feet on Grant avenue,
and fronts on the Allegheny river.   The defendant by itself or
through its alienees being in possession of the land, the burden rests
on the plaintiffs to show a complete title on their part, irrespective
of what claim or title the defendant may have; the principle being
well established that the right of the plaintiff to recover in eject-
ment depends on the strength of his own, and not on the weakness
of his adversary's, title.   "In an action of ejectment the plaintiff
must recover, if at all, upon the strength of his own title.   The weak-
ness of his adversary's cannot avail him."   McNitt v. Turner, 16
Wall. 362, 21 L. Ed. 341.   The first question, therefore, is as to the
validity of the plaintiff's title.   In the abstract filed by the plaintiffs,
August 5, 1901, the only title claimed by them is that based upon a
patent of the commonwealth to Luke Loomis, dated August 15,
1837, enrolled in Patent Book H, vol. 37, p. 547, which, it was therein
alleged, conveyed the property in dispute.   Subsequently by amend-
ment they set up that their grantors "entered into constructive posses-
sion of the land in dispute 9th day of July, A. D. 1822, or thereabouts,
and into actual possession about the 15th day of August, A. D. 1837;
and that plaintiffs and their grantors held continuous, uninterrupted,
hostile, and notorious possession of the same from said times up to
the year 1881, when they were ousted by the defendant's grantors."
The plaintiffs' claim, therefore, rests on the Loomis patent and on a
title based upon adverse possession.

The question of the validity of that patent involves an examina-
tion of the legislation, plan, and original grants and conveyances of
the Reserve Tract upon which the city of Allegheny stands.   The
Act of March 12, 1783, 2 Smith's Laws, p. 62, provided for the sale
of land north of the Ohio, west of the Allegheny, and south of a
line running from the mouth of Mahoning creek, a tributary of the
Allegheny, to the western boundary of the state.   From the fact that
provision was made in said act that payment could be made in cer-
tificates of depreciation given to the officers and soldiers of the Penn-
sylvania line, this section became known as "Depreciation Lands."

¶ 2. See Adverse Possession, vol. 1, Cent. Dig. § 65.

A reservation was made in this act of, inter alia, the site of Allegheny City in the following words: "Reserving to the use of the state three thousand acres, in an oblong of not less than one mile in depth from the Allegheny and Ohio rivers, and extending up and down the said rivers, from opposite Fort Pitt, so far as may be necessary to include the same." It will be noted that what is here reserved is an oblong or solid body of land, that it extends in depth "from the Allegheny and Ohio rivers," and that it extends "up and down the said rivers," and that such language would not include islands. The act of September 11, 1787, 2 Smith's Laws, p. 414, provided that upon said reserved land a town, in lots, with a suitable number of outlots, be laid out and surveyed, and enacted, "and the streets, lanes and alleys of the said town and outlots shall be common highways forever." In pursuance thereof a survey was made and a plan adopted by the state in which there was laid out a lane or street, afterwards known as "Bank Lane," extending along the north shore of the Ohio and Allegheny rivers, and fronting the south line of outlots 21 to 31, both inclusive. The lots at both ends of the lane were plotted as bounded by the river. The east end of the lane, as indicated on the plan, began at a turn of the inward bend of the stream caused by the water passing around an island depicted on the plan map. The island was not laid out or plotted in lots, and, so far as the plan indicates, was not treated or regarded as a part of the Reserve Tract. No provision existed by law at that time for the sale of islands in the Allegheny and Ohio rivers, and by the act of April 8, 1785, 2 Smith's Laws, p. 322, § 13, they were excepted from appropriation; and the Reserve Tract being, as we have seen, "in depth from the Allegheny and Ohio rivers," and "extending up and down the said rivers," the state's surveyor must have acted upon the assumption that the island was not a part of the Reserve Tract, and that the south boundary of the tract opposite the island was the water course between it and the mainland. The deeds for the several outlots mentioned recite the plan; describe the lots as situated "on the north side of Bank lane, on the river Ohio," and as extending south "to Bank lane as aforesaid; thence along the said lane as it extends up the river Ohio." That there was an island as indicated on the plan map, that its separation from the mainland was of such marked character as to make it known as an island and not a part of the mainland with intervening marsh land, is we think fully evidenced by the fact that it was a topographical feature worthy of note as an island by contemporaneous travelers and writers. In an article by Judge Breckenridge in the first number of the Pittsburgh Gazette, dated July 29, 1786, and reprinted in Craig's History of Pittsburgh, p. 190, the island is noted as located about 70 yards from the shore, and having a lofty hill upon it. The statement is as follows:

"At the distance of about four or five hundred yards from the head of the Ohio is a small island, lying to the northwest side of the river, at the distance of about seventy yards from the shore. It is covered with wood, and at the lowest part is a lofty hill famous for the number of wild turkeys which inhabit it. The island is not more in length than one-quarter of a mile, and in

breadth about 100 yards. A small space on the upper end is cleared and overgrown with grass. The savages had cleared it during the late war, a party of them attached to the United States having placed their wigwams and raised corn there. The Ohio, at the distance of about one mile from its source, winds around the lower end of the island and disappears."

In a volume of travels written by F. Cuming, and printed at Pittsburgh by Cramer, Spear & Eichbaum, 1810, entitled "Sketches of a Tour," the island is referred to as seen from the point:

"Continuing to turn to the right from our original center, the point, we see the Ohio for about two miles, with Elliot's Mills or Saw Mill Run, below Coal Hill on the left, an amphitheater of lower hills above Chartiers creek and McKee's farm to Brunot Island in front, and Robinson's Point and Smoky Island at the mouth of the Allegheny on the right."

It will thus be seen that, as a fact, the southern boundary of the Reserve Tract opposite this island was this inner channel of the Allegheny. Indeed, in the case of Allegheny v. Reed, 25 Pa. 335, it was said by the Supreme Court of Pennsylvania:

"The river and the islands in it lie outside of the reserved tract. * * * An authority to survey the tract of land, bounded by a river, does not authorize the survey of the islands in the river, although they are opposite to the tract surveyed."

It will also appear that the plan of the town and the conveyances of outlots 21 to 31, inclusive, were made on such assumption.

In laying out the plan, dedicating the streets and lanes, and selling the lots by the plan, the state of Pennsylvania acted as an individual or private proprietor. "It must be remembered," says the Supreme Court in Allegheny v. Nelson, 25 Pa. 334, "that the state, in the sale of her lands, acts as an ordinary individual, and not as a sovereign." As, therefore, an individual proprietor cannot, so also the state cannot, make an after conveyance inconsistent with its prior plan. The legal effect of this plan and the conveyances made thereunder were determined by the Supreme Court of Pennsylvania in the case of Allegheny City v. Moorehead, 80 Pa. 138. It was there said in reference to the outlots abutting Bank lane:

"These lots were laid out by the state on her own property [the Reserve Tract], and were made to bound on streets and lanes, and on each other, just as the other lots in the town were. Bank lane was laid out upon the north bank of the river, following its windings, and its northern line was made the southern boundary of these lots. They did not cross Bank lane to the river. If the doctrine of Paul v. Carver, 2 Casey, 223, 67 Am. Dec. 413, as to the boundaries by the thread of a highway, were applicable to such a case as this, it would extend the title of the lot owners only to the middle of the highway, and not across it. Their interest on the south side was not a title to the soil, but an easement in common with all others in the use of the street—a use necessarily bounded by the water line, for the land highway could extend no further."

And this was, indeed, but applying the principle established in Pennsylvania in Wharton v. Garvin, 34 Pa. 341. The construction thus given to a state statute and to a plan and conveyance made by the state, by the court of the highest resort of such state, will be followed by a federal court. Gormley v. Clark, 134 U. S. 338, 10 Sup. Ct. 554, 33 L. Ed. 909; Stutsman County v. Wallace, 142 U. S. 293, 12 Sup. Ct. 227, 35 L. Ed. 1018. Such construction is, more-

over, in accord with federal authorities. Morris v. The United States, 174 U. S. 196, 19 Sup. Ct. 649, 43 L. Ed. 946; Barclay v. Howell, 6 Pet. 507, 8 L. Ed. 477.

Having found as a fact, which we do, that, at the date of the map, sale, and dedication, there was a well-marked water course between the island and the main shore at the locus in quo, it follows from the law as thus laid down that Bank lane was dedicated as a public highway, and that as such it extended to the water line. Why such should be the law is forcibly stated by Mr. Justice Matthews in Potomac Steamboat Co. v. Upper Pot. S. Co., 109 U. S. 685, 3 Sup. Ct. 453, 27 L. Ed. 1070, where he says:

> "It is not denied and never was questioned that, as to the streets whose termini abutted on the river, the water front was subject to the riparian rights of the public for use as wharf or dock or landing place. On what principle can a distinction be drawn between that case and the one in hand, where the line of the river constitutes the side of the street running along the shore?"

That the authorities have not used or improved the highway is immaterial. The right was not dependent on its use. Barclay v. Howell, supra; Potomac Steamboat Co. v. Upper Pot. S. Co., supra. It is evident, therefore, that the act of the state in laying out and dedicating Bank lane as a public highway extending to the water edge was such act as to preclude it from afterwards conveying such highway to a grantee to be held as private property. "After being thus set apart for public use," says the court in City of Cincinnati v. White, 6 Pet: 437, 8 L. Ed. 452, "and enjoyed as such, and private and individual rights acquired with reference to it, the law considers it in the nature of an estoppel in pais, which precludes the original owner from revoking such dedication. It is a violation of good faith to the public, and to those who have acquired private property with a view to the enjoyment of the use thus publicly granted."

The same doctrine was announced by the Supreme Court of Pennsylvania in the Penny Pot Landing Case, 16 Pa. 89:

> "The rights of the adjacent and neighboring lot holders as well as the public to Vine street so enlarged were vested rights, of which they could not be divested by William Penn; and if it were not competent to Penn, the proprietor and founder, to divest or impair his grant and dedication of this extended street, it cannot with any propriety be supposed that this could be done many years after his death, by the acts on the part of some of the subordinate officers of the proprietary government."

Yet this is what the state almost 50 years afterwards did if its patents to Luke Loomis be sustained. On August 15, 1837, by such instrument it sought to convey to Loomis, in fee simple, a part of the land theretofore dedicated to the public as Bank lane. What was the effect of such patent? The validity of a patent depends on the authority of the state's agent to issue it. The law in that regard is well settled (Hunter v. Howard, 10 Serg. & R. 9; Morris v. United States, 174 U. S. 243, 19 Sup. Ct. 649, 43 L. Ed. 946; Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875; Doolan v. Carr, 125 U. S. 618, 8 Sup. Ct. 1228, 31 L. Ed. 844), and is well summed up in Sargeant's Land Titles of Pennsylvania, p. 169, as follows:

"The land office, merely as such, possesses no judicial power; the officers were purely agents. Their acts, where they exceed their authority, are void, like the acts of other agents. Even if the title of a party be consummated by a patent, every one interested in the land thus acquired may contest the validity of the grant. Their powers are to grant lands in the name of the commonwealth as public agents, but under the conditions provided by law, of which every man is bound to take notice. They have no authority to dispense with the provisions of a positive law, and, whether they err from ignorance, inadvertence, or misinformation, their acts cannot conclude."

At the time of the issue of this patent, in 1837—and that is the date by which its validity is tested (Allegheny City v. Reed, 24 Pa. 43; Morris v. The United States, supra)—the conditions were different in no material respect from those existing at the time of the dedication of Bank lane, in 1783. It is true that the island in front of it had been largely or wholly swept away, but the inner water course still existed, and it is evident that the island's disappearance wrought no change in existing rights so far as the portion of Bank lane involved in this case was concerned. Upon careful consideration we are therefore of opinion that the acts of the agents of the state of Pennsylvania in issuing the Loomis patent were without warrant of law, indeed were contrary to law, and that said patent is void, and vested no title in Luke Loomis, or in the plaintiffs who claim under him.

This view of the case renders it unnecessary to discuss in detail two other grounds affecting the validity of this patent. Upon them we express no opinion, but we deem it proper they should be here adverted to. These grounds are: First, that under the forms and practice of the land office and the laws of Pennsylvania there was in 1837 no authority to issue a patent for land situate between the banks of a navigable stream between high and low water mark, and detached from the land along the bank; second, that, if the land covered by the Loomis application and warrant was patentable, the survey was in direct violation of the statute governing surveys along navigable streams of lands acquired by the Indian treaty of October, 1784, and the patent issued thereon was without warrant of law and void. As to the first ground, it will be noted that the main body of the navigable rivers of this state are not subject to private appropriation, under the ordinary system of land laws. Poor v. McClure, 77 Pa. 219, and cases cited. It is true the lines of a riparian owner extend to low-water mark, subject to the public rights of navigation between high and low water mark. Stover v. Jack, 60 Pa. 343, 100 Am. Dec. 566; Wood v. Appal, 63 Pa. 215. But this grant of inter-bank rights is not a grant by the state of inter-bank land as such, but an incident to the grant of lands along and on the banks, and a right necessary to the full enjoyment of such upper land. When it comes to a grant of inter-bank lands not only is no express provision found, but such power, it is asserted, is denied by necessary implication. The first section of the act of April 3, 1792, 2 Smith's Laws, pp. 70, 71, describes the land for appropriation as lying east of the Allegheny river, and the second as lying west. In both instances the river is excluded. In Poor v. McClure, cited above, Judge Agnew, after citing the various acts, says: "In all

this legislation we discover a fixed intent to open to general appropriation ordinary lands outside of the navigable streams, and as a consequence no surveys were made across those streams." In Freytag v. Powell, 1 Whart. 537, it was held by the district court (Philadelphia) "that land on the navigable rivers of Pennsylvania between high and low water mark, detached from land above high-water mark, is not within the jurisdiction of the land office, and it is not grantable in the usual way, upon the usual terms by warrant and survey." In Jones v. Janney, 8 Watts & S. 443, 42 Am. Dec. 309, it is said:

"The character of this kind of property is such that land bordering on the flats and the flats naturally go together. Their most beneficial enjoyment is derived from their connection. * * * Flats have always been deemed as appurtenances to the adjoining river front. They pass with it as appurtenances, if not expressly excluded. They are a peculiar kind of right, situate in the bed of a navigable river, when the tide flows and reflows, covered by the water at high tide, and left bare at low."

In Barton v. Bouvier, 1 Phila. 523, it was held by the district court (Philadelphia) that whether the adjoining fast land was in the state or in the individuals the patent to marsh land adjoining was void, "in the one case as interfering with their rights to have the river as a boundary, in the other as violating the rules necessary for the advantageous disposition of the public property." As to the second position, it will be noted that the land in question was acquired by the state by the Indian treaty of October, 1784, and as such its opening for sale was authorized by the act of April 8, 1785, 2 Smith's Laws, p. 323. Section 15 of that act provides:

"The surveyor general and his deputies are hereby severally directed and enjoined to locate and survey, or cause to be located and surveyed, the full amount of land contained and mentioned in any warrant, in one entire tract, in such manner and form, as that such tract shall not contain in front on any river more than one-half of the length or depth of such tract, and to conform the lines of every survey in such manner, as to form the figure or plot thereof, as nearly as circumstances will admit, to an oblong of three times the breadth thereof."

The Loomis survey was in direct violation of this provision. It shows a narrow strip fronting on the river 147 perches, at its lower end 8, and at its upper end 10 perches in depth—proportions utterly at variance with the explicit directions of the act (Sargeant's Land Titles, p. 271), contrary to the instructions given to the agents of the proprietaries in 1765 (see Smith's Laws) 163; Bear v. Russel, 2 Smith's Laws, p. 168; Barton v. Bouvier, supra). It is true that in Wharton v. Garvin, supra, it is stated that this act is only directory, and that "a survey by different dimensions, when returned and accepted at the land office, was never supposed to be void." But it will be noted that such question was not before the court in that case, and that no authority is cited for the statement. In the absence of any decision by the Supreme Court of the state, the question as to whether an act in violation of an enjoined duty was not void as lacking precedent authority is still an open question. But, as we have said, the fact that such patent is invalid on other grounds renders needless the determination of these two questions.

The only other asserted title to the strip of ground between Bank lane and the water of the inner channel of the river is that based on adverse possession. It must, however, be borne in mind that the ground in question down to the water's edge was part of a dedicated highway, and that no adverse possession, however protracted, could bar such public right. Commonwealth v. Alburger, 1 Whart. 486; Commonwealth v. McDonald, 16 Serg. & R. 395; Rung v. Shoneberger, 2 Watts, 23, 26 Am. Dec. 95; Black's Lessee v. Hepburne, 2 Yeates, 331; Penny Pot Landing, 16 Pa. 88. But, waiving this question, we find no evidence of facts sufficient to vest in the plaintiffs a title by adverse possession for the statutory period. Such title, if proven, has been held sufficient to entitle one to recover in ejectment; "for the right of possession is acquired by twenty-one years' possession, and this right is not only sufficient to support a defense, but it is a positive title, under which one may recover as plaintiff in ejectment." Pederick v. Searle, 5 Serg. & R. 240. But the principle is also well established in Pennsylvania that nothing short of actual, continued, visible, notorious, distinct, and hostile possession for 21 years will give a title under the statute of limitation. Mercer v. Watson, 1 Watts, 330; Ewing v. Alcorn, 40 Pa. 500; Sorber v. Willing, 10 Watts, 142; Shaffer v. Lowry, 25 Pa. 252. Now, while there is some evidence to show that a part of this general river front had been at one time fenced in and cultivated, yet it was not shown that such possession extended continuously over 21 years, that it was a possession by one under whom the plaintiffs claim (and a plaintiff must show such connection in order to avail himself of such possession—see Schrack v. Zubler, 34 Pa. 38), or, indeed, was even such possession as was shown a holding of the particular land sought to be recovered in this action. As to it there was no evidence that it was fenced, cultivated, occupied, that taxes were assessed or paid upon it, or, indeed, any of the indicia of adverse possession. The only thing was the forbidding occupants of shanty boats the privilege of mooring their boats along the banks in front of Judge Snowden's residence.

The nature of the alleged possession of this property is fairly shown in the testimony of Mrs. Mary K. Douglass, who lived on Bank lane, adjoining Judge Snowden, the ancestor of the plaintiffs. Mrs. Douglass says that she lived there as a child from about 1826 to 1856, was absent five years, and returned in 1861. She says that from girlhood she was led to believe that her father and Judge Snowden when they bought the property owned to low-water mark. Touching exercise of ownership, her testimony was as follows:

"Q. Did you see any acts or anything done by members of the family to take control of it in Judge Snowden's time or that of his family? A. I never did. Q. Who occupied it, as far as you know? A. Occupied what? Q. The land in front of their property. A. No person, but Jo boats occasionally. Q. When the Jo boats were landed there, do you know what was done? A. We ordered them off; * * * told them they were on private property, and they had no right there. Q. How did you come yourself, Mrs. Douglass, to exercise this authority of ordering the boats away? A. They were in front of our house and were very objectionable."

Referring to the land in front of her own and Judge Snowden's lot on her return in 1861, she was asked:

"Q. How about this land in front, south of Bank lane; who had control of that? A. No persons seemed to have control of it. It was just lying in front of our properties, and we thought we had the right to it. Q. Did you claim it? A. Never made any claim to it, because nobody interfered with us, and we made no claim."

She further says that no one took possession or interfered with it until the railroad came. She states the land between Bank lane was never fenced in any way, and that there were no buildings on it. Mrs. Foster, a granddaughter of Judge Snowden, was asked as to acts of ownership by her father, and said:

"We would never allow them to haul gravel from there. The city of Allegheny would try to haul sand from there when they were fixing the streets, and we would order them off. * * * Then, another thing, there were no Jo boats in front of our house, for father wouldn't allow it. * * * When the river would rise these boats would come in there with their families, and tie up in front of us, if they could. Father would order them off. There was never any boats stayed in front of Snowden's place."

### Mrs. Harrison, another granddaughter, was asked:

"Q. Did anybody else ever during the time that you lived in that location enter upon or take possession of that property? A. They did not. Q. Or occupied it in any way? A. No. Q. What was it used for by your father? A. It was used for the view more than anything else. He wanted the view of the three rivers, and explained to me that the three rivers came in there, the Monongahela, the Allegheny, and the Ohio, and he wouldn't have anything built up in front of him. * * * Q. You say that you had possession of the property. What did you ever do to take possession of it? A. We just always considered it ours, like you would look out over your lawn. We watched the river and enjoyed the view."

Morrison Foster, who was an owner of property fronting on Bank lane, and who was familiar with the property in suit since 1834, says there was nobody on the property. Frank Snowden, who lived on Bank lane fronting the property in dispute from 1861 to 1876, was asked, "Q. What acts of ownership or possession or control of that property did your father exercise from 1861 to the time of his death?" and said: "The only act of possession would be to allow no one to get in front of him. He was very jealous of any one being in front of him." As to the remaining portion of the ground embraced in this action, it may be described as a strip lying between the north side of the river channel, before referred to, and the low-water line of the Allegheny river, fronting the south shore of what was formerly an island site. The plaintiffs are the heirs of John M. Snowden, who owned the lot on the north side of Bank lane immediately back of the property in dispute, and many of the witnesses called, together with some of the Snowden heirs, base their claim to this property fronting their lots upon the fact of, and as an incident to, the ownership of corresponding lots abutting the north side of Bank lane. Such title is not set up in the abstract, and therefore need not be discussed, but we deem proper to remark that in view of the express decision in Allegheny City v. Moorehead, supra, and for the reasons

set forth in that opinion, we are of opinion that no exclusive possessory title to land south of Bank lane ever vested in the lot owners north of it. Their rights were defined in the foregoing case, where it was said: "Their interest on the south side was not a title to the soil, but an easement in common with all others in the use of the street—a use necessarily bounded by the water line, for the land highway could extend no further." Of physical possession of such fronting property sufficient to create a title by adverse possession there is absolutely no evidence. The claim was not evidenced or accompanied by possession. It had no existence in acts. The ground lay vacant and unoccupied, even when bared in part by low water. It will be noticed, also, that, in the ejectment case of Allegheny City v. Moorehead, F. L. Snowden, the ancestor of the plaintiffs, was called as a witness. That case involved the title to the land we are now considering, and Mr. Snowden was called as a witness on behalf of Allegheny City on the trial, in 1875, and his testimony was offered by the defendant in the present case. In that case he testified that he did not claim the property there in dispute. Under all views of this case, we are of opinion the plaintiffs have not shown a valid title to the land involved in this case, and the finding must be for the defendant. This disposition of the case renders it unnecessary to discuss the title set up by the defendant, and upon it we express no opinion. Under that view, we deem it proper to say there is no question of public easement or right of navigation involved in this case, and therefore this case is determined, leaving the question of public easement, if any exists, to be passed upon when it shall arise.

### Findings of Fact.

(1) The patent of the commonwealth of Pennsylvania to Luke Loomis, dated August 15, 1837, was located upon Bank lane, a highway dedicated to the public by the commonwealth.

(2) The plaintiffs were not in possession for 21 years of any of the land for which this action is brought.

### Conclusions of Law.

(1) The patent of the commonwealth of Pennsylvania to Luke Loomis, dated August 15, 1837, is void.

(2) No title by adverse possession has been established by the plaintiffs.

(3) The plaintiffs have not shown a right to recover.

Verdict: The court finds in favor of the defendant.