80     118
35SC ¹²248

## Allegheny City *versus* Moorehead *et al.*

1. Killbuck in 1806 applied to the Land Office for an island at the head of the Ohio river; he proceeded no further and no warrant was issued. In 1832 the island was carried away by a flood, leaving only a sand bar: *Held*, that although this prevented a grant of the ground under the land laws, it did not prevent a grant by special law.

2. In the location of a body of land for the benefit of soldiers the Commonwealth reserved 3000 acres on the east and north of the Ohio and Allegheny rivers. and directed it to be laid out in lots for a town (afterwards Allegheny City); some of the lots abutted on the north side of a street called Bank lane, " as it runs by the courses of the river :" *Held*, that the title of the lot-owners to the soil did not cross the street to the river.

3. The interest of the lot-owners south of the north line of the street was but an easement in common with all others in the use of the street, which was bounded by the water line.

4. The water highway began at the water line and the public right was such only as could be claimed by all for navigation and other purposes.

5. The street was widened by deposits by the owners of the lots and by the city and was widened by the city to a defined width; this was not as an accretion by gradual deposits or as an enlargement by dereliction of the water.

6. The channel between the island and Allegheny City became so filled as to be useless as a highway, unless in high water; the land lying between the natural low-water line of the island and Bank lane belonged to the Commonwealth.

[Allegheny City v. Moorehead.]

7. The Act of April 16th 1858, under which commissioners were appointed to fix the water lines in the Ohio and Allegheny rivers, enacted that " all riparian rights now vested in the state lying between high-water lines and the river shall be vested in the corporations in which the same shall be :" *Held*, not to be a grant of the soil.

8. The Act of 1858 could not operate so that the commissioners in running out the low-water line on the northern shore could include part of Killbuck island.

9. The object of the Act of 1858 was not to transfer titles, but to mark the boundaries of riparian rights and make them certain and permanent in their extent.

10. An object of the Act of 1858 was to regulate the right of navigation along the shores, by fixing high- and low-water lines, which would definitely determine the extent of the exercise of the right to which the owners of land could exercise their own right under the law of the state.

11. The extension of the low-water line of the northern shore over a part of the former site of the island did not pass the title of the Commonwealth in the intermediate channel or to the bars and sand banks within the lines, or in the soil of Bank lane, to the owners of the lots on that street, nor to any one else.

12. The title of an act was " To perfect the title to Killbuck island * * * and directing the surveyor-general to issue a patent therefor ;" the land described in the act covered more than the island. In ejectment for the land mentioned in the act, the recovery was for less than Killbuck island : *Held*, that the act was constitutional, at least for the extent of the recovery.

13. Allegheny County Home's Case, 27 P. F. Smith 71 ; Dorsey's Appeal, 22 P. F. Smith 192 ; Poor *v.* McClure, 27 P. F. Smith 214 ; Wainwright *v.* McCullough, 13 P. F. Smith 66 ; Zug *v.* Commonwealth, 20 P. F. Smith 138, adhered to.

November — 1875.   Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Common Pleas, No. 2, of *Allegheny county :* Of October and November Term 1875.

This was an action of ejectment, brought September 2d 1874, by James K. Moorehead and others against the city of Allegheny.

The premises are described in the writ as follows :—

" All that certain tract of land lying, being, and situate at the head of the Ohio river, near to and adjoining the north bank thereof, being north and west of the ' Point,' in the city of Pittsburg, formerly known as ' Killbuck' or ' Smoky island,' and bounded and described as follows, viz. : Beginning at the angle or pend in Bank lane, as the same is laid down in the original plan of the borough (now city) of Allegheny, thence S. 14°, E. 60 perches, more or less, to the Allegheny river, on the south side of said island ; thence down said river * * * (by various courses and distances without other description) to Bank lane and thence up Bank lane to the beginning."

Killbuck island was situated at the confluence of the Allegheny river with the Ohio, lying near the northeastern shore and close to the territory, now Allegheny City ; the main channel of the Allegheny and Ohio rivers being on the southward side of the island, between it and the city of Pittsburg ; the channel on the

[Allegheny City *v.* Moorehead.]

other side being almost filled, and incapable of being used at all except in times of high water.

The plaintiffs claimed under a patent (hereafter mentioned) granted in 1873, under a special Act of Assembly, for "Killbuck island," describing the grant by courses and distances. The main questions were whether the premises set out in the writ passed anything to the grantees, and if so, the extent of the grant.

By Act of March 12th 1783, 2 Sm. Laws 62, it was recited that by the Act of December 18th 1780, the certificates of depreciation given to the officers and soldiers of the Pennsylvania line, should be receivable at the Land Office equal to gold and silver in payment of the purchase-money of lands, and it was therefore enacted, for the more effectual complying with the intentions of that law, that there should be located a tract of land, beginning where the western boundary of the state crossed the Ohio river, thence up that river to Fort Pitt, thence up the Allegheny river to the mouth of the Mogulbughtiton (now Mahoning) creek, thence by a west line to the western boundary of the state, thence south by the said boundary to the place of beginning; reserving to the use of the state 3000 acres in an oblong, of not less than one mile in depth from the Allegheny and Ohio rivers, and extending up and down said rivers from opposite Fort Pitt so far as may be necessary to include the same.

This tract was called the "Reserve tract;" it was surveyed in April 1785, under the direction of the surveyor-general; by Alexander McLean, and returned as containing 3025 acres and allowance.

By the Act of September 11th 1787, 2 Sm. Laws 414, reciting the foregoing act, it is enacted :—

Sect. 2. That the president or vice-president in council cause to be laid out and surveyed in town lots, with a competent and suitable number of out lots, for the accommodation thereof, in the said tract, and to cause to be laid out and surveyed the residue of the said tract in lots, which last-mentioned lots shall not be less than one acre, nor more than ten acres each.

Sect. 3. * * That upon the return of such surveys, which are hereby directed to be made to the president or vice-president in council, they shall and are hereby authorized to sell the whole of the said lots, as they shall think most to the advantage of the state, and to convey the same.

Sect. 4. * * That the president, or vice-president, in council, shall reserve out of the lots of the said town for the use of the state, so much land as they shall deem necessary for a court house, goal and market house, for places of public worship, and for burying the dead, and without the said town one hundred acres for a common pasture ; and the streets, lanes and alleys of the said town and out lots shall be common highways for ever ; and that the sale of the said lots and out lots herein mentioned, or any of the said

[Allegheny City *v.* Moorehead.]

lots or out lots, shall be made in the town of Pittsburg, or in the City of Philadelphia, at the discretion of the council. * * *

In accordance with this act, a survey was made laying out the "Reserve" tract in lots. The town lots were laid out in the central part of the tract, 102 acres being set apart in an oblong shape for "Commons and Burying Ground;" the remainder of the tract was laid out in out lots; they varied in size from a few acres to large farms. Streets were laid out, but no definite width was indicated on the plot. A street called "Bank lane" was laid out along the bank of the Allegheny and Ohio rivers; no width of this street is given, but its north line is the south line of the lots next to the river. These lots are described in the patents and subsequent deeds as "situate on Bank lane on the river (Ohio or Allegheny, as the case might be), beginning on said lane at, &c. (by various courses and distances), thence south, &c., to Bank lane aforesaid, thence along the said lane as it runs by the several courses of the river, &c., to place of beginning."

The lots bounding on "Bank lane" in the proceedings of the Executive Council are spoken of as "river lots." At the time the "Reserve" tract was laid out, there was at or near the junction of the Allegheny river with the Ohio river, an island, afterwards known as "Killbuck" or "Smoky island;" it was in front of Bank lane (which was afterwards called "South avenue"), and appears both in McLean's plot and in the plot of the survey laying out the town lots on the "Reserve" tract; it was not, however, part of that tract. The head of the island, as appears by McLean's plot, was about opposite the "Point" in Pittsburg at the junction of the Monongahela and Allegheny rivers. The title to it was in the Commonwealth; at the time of the survey all islands in the Allegheny, Ohio and some other rivers, were reserved from public entry in the Land Office; they were to be disposed of by public sale. On the 27th of January 1806, an Act of Assembly was passed (4 Sm. Laws 268) authorizing the officers of the Land Office, on due application, to issue warrants of survey for any island in the Ohio, Allegheny and Delaware rivers. The act required the officers of the Land Office to appoint three persons to value the lands in such islands per acre, and certify their valuation to the secretary of the Land Office, who was then to issue a warrant to the applicant, he having first paid to the Commonwealth at least one-third of the valuation. The balance of the purchase-money was to be a lien on the land, and a patent was to issue when the whole amount of the valuation should be paid; the full payment to be within four years.

On the 27th of June 1806, Henry Killbuck, an Indian chief, made an application to the Land Office "for an improved island at the junction of the river Allegheny with the Ohio, known by

[Allegheny City *v.* Moorehead.]

the name of Killbuck's, or Smoke island, containing about twenty acres, be the same more or less, opposite the town of Pittsburg."

An order was issued July 7th 1806, to three appraisers, in accordance with the directions of the act. On the 28th of August the appraisers reported that the island contained about 17 acres; that it was improved; that having had regard to the wood, soil, &c., its distance from the main land, and the advantages in regard to the fisheries, &c., they valued it at $20 per acre. Killbuck did not pay any purchase-money, nor proceed further in the matter; he, therefore, obtained no warrant of survey.

By Act of April 14th 1828, Pamph. L. 368, Allegheny town was erected into a borough. The boundaries commenced on the banks of the Allegheny river, on the northeast side of the town, the line then ran northwardly, then eastwardly, then southwardly " to the middle of the Ohio river, thence by a line up the middle of same, and of the Allegheny river along the line of the city of Pittsburg, to a point opposite the place of beginning, thence by a straight line to the place of beginning." Killbuck island was included within these boundaries.

In 1832 the larger part of Killbuck island was washed away by a great flood; subsequent floods washed away the remainder, so that in 1840, and since, where the island was, has been merely a bar in the river.

By Act of April 13th 1840, Pamph. L. 303, the borough of Allegheny was incorporated into a city with its original boundaries.

On September 3d 1849, William Reed made an application to the Land Office to take up Killbuck island; it was described in the application as containing about 44 acres. A caveat was filed against the application. The appraisers, appointed under the Act of 1806, reported that the ground applied for was mostly " a gravel bar, frequently covered by high freshets, but bare at ordinary stages of water." They further reported that it was once the base of Smoky, or Killbuck island, and they appraised it at $135 per acre. On the 15th of September 1851, the caveat was heard before the board of property, who directed a warrant of survey to issue to Reed, on payment of one-third the valuation. Reed on the same day paid $1999.12, the one-third of the valuation, and the warrant of survey accordingly issued; by this survey the ground applied for contained 43 acres 127 perches. Reed brought an action of ejectment against the city of Allegheny to recover the tract so surveyed to him. He recovered in the court below. The judgment was reversed in the Supreme Court (12 Harris 39), on the ground that the land surveyed was not an island, but a mere sand-bar, having no land capable of sustaining vegetation, and, therefore, not the subject of entry in the Land Office. The Supreme Court further held that the foundation of

the island belonged to the Commonwealth, and that she held it, as she did the bed of the river and all sand-bars, in trust for all her citizens, as a public highway.

Previously to 1857 there had been disputes between the city of Allegheny and the owners of the river lots, as to the true location of the northern line of Bank lane. On the 15th of September of that year, the City Councils finally fixed this line, and then changed the name of the lane to South avenue; no width of the avenue was defined.

On the 16th of April 1858, an act was passed (Pamph. L. 326): " To establish high- and low-water lines in the Allegheny, Monongahela and Ohio rivers, in the vicinity of Pittsburg."

The act recited that lines of lands along the shores of the rivers at and near Pittsburg, had not been ascertained, and that it was important to the owners of such lands, persons navigating the rivers and the corporations adjacent to them, and to all persons interested, to have their several rights, &c., " in extension and limitation," defined. It then required the District Court of Allegheny county to appoint three commissioners, who, taking to their assistance a competent surveyor, should examine the shores, surveying and marking on them " lines of ordinary low water and lines of ordinary high water," along the rivers named within the limits set out in the act, and around the shores of all the islands within those limits (which included the premises in dispute), except where lines had already been established by law, such water lines to be laid out so " as will most perfectly secure and perpetuate the navigable channels of said rivers, and best promote the safety and convenience of vessels, &c.,　*　*　*　and be most suitable in all respects for the general benefit of the public at large." The commissioners were required to make a correct map or plan of their survey, with proper descriptions and explanations, and return it to the District Court, to be filed in the office of the prothonotary of that court for public inspection, &c.; the court to appoint a day to hear objections, and, after hearing, adjudge whether the work of the commissioners should be fully established, or returned to the commissioners for re-examination, and, if so recommitted to them, to be reconsidered by them and returned with such amendments as they might think proper; after the final approval by the court, to be recorded under the direction of the court, and the map or plan and the lines, &c., to " be adjudged and taken firm and stable for the purposes aforesaid."

By sect. 5, " All riparian right now vested in the state, lying between high-water lines and the rivers, within the district aforesaid, shall from thenceforth thereafter be vested in the several corporations within whose limits the same now is or hereafter shall be."

On the 30th of March 1861, the commissioners returned their

[Allegheny City *v.* Moorehead.]

surveys with the appropriate maps and plans.   They were ordered to be filed in the prothonotary's office for inspection, and he directed to give notice, &c.

Exceptions were filed to the commissioners' report; on hearing they were dismissed, and it was adjudged that the maps and plans be fully established according to the provisions of the Act of 1858.

On the 8th of April 1873, Pamph. L. 860, an act was passed: " To perfect the title to Killbuck island, at the head of the Ohio river, north and west of the 'point,' in the city of Pittsburg, authorizing and directing the surveyor-general to issue a patent therefor."

The act recited that " Killbuck, an Indian of the Delaware tribe, became seised and possessed of a certain island at the head-waters of the Ohio river, near to and adjoining what was afterwards the southwestern portion of the city of Allegheny, nearly opposite the 'Point' in the city of Pittsburg, the said Killbuck being placed in possession of said island for services in the French and Revolutionary wars."   The act further recited that on the 23d of November 1803, Killbuck conveyed the island, or a large part of it, to Abner Barker, and in 1806 applied to the Land Office for the island (as is before stated); that the land was afterwards returned as unseated, and on the 10th of June 1818, sold to George S. Birnie; that the titles of Killbuck and Barker, by sufficient conveyances, became vested in Zenas Neel, and he, on the 24th of September 1829, redeemed the same from Birnie, Neel being then in possession of the land, residing there with his family, and operating a foundry on it.   The act further recited that the soil had been carried away by the flood of 1832 and subsequent floods; that Neel died in 1834, the sole and undisputed occupant and " owner of the possessory title to said island by himself and those under whom he claimed, from a period previous to the formation of state government;" that the heirs of Neel, by deed of September 10th 1849, for the sum of $8000, conveyed the island by metes and bounds to Andrew Fulton, John E. Parke and others, who had since held the title and were desirous to perfect their title by a patent from the Commonwealth; that the owners were unable to obtain such patent under the land laws of the Commonwealth, for the reason that the Supreme Court had decided that insomuch as it was not susceptible of cultivation in its present condition, the surveyor-general had no power to issue a patent.   It was then enacted: Sect. 1. That the title of James K. Moorehead, and a number of other persons named in the act, as tenants in common in equal interests to a " piece of land, hereinafter described, known as Smoky or Killbuck island, is hereby ratified and confirmed; and they and their heirs and assigns are hereby declared to be seised of a fee simple title in the same.'.'   Sect. 2. On the payment of $300 for the use of the Commonwealth, the

[Allegheny City *v.* Moorehead.]

surveyor-general was directed to issue a patent to the parties named in the first section, for a piece of land; the same as described in the writ in this case. A patent was issued April 29th 1873, in pursuance of this act. Those of the plaintiffs who were not named in the act or patent, derived title under the patentees. A plot of plaintiff's claim under the patent shows that School street in Allegheny city is about coincident with the north side of plaintiff's claim; it appears also that " Union bridge " (referred to in the verdict), leading from Pittsburg across the Allegheny river to the island, is about 100 yards east or up the Allegheny river from " the point " in Pittsburg.

The case was tried June 7th 1875, before White, J.

There was evidence for the plaintiff that previously to 1832, there was a small channel at the head of the island, which ran down between that and the main shore, thus forming the island; it was about 100 feet from Bank lane; the main shore was a perpendicular bluff; the water would be at the base of the bluff about half the year; in dry times the water would not run there. Bank lane was on the top of the bluff; along some places it was so narrow that a horse could not travel; a man could walk along it; there was a path and a fence some places. At a low stage of water there was a slough only 3 or 4 feet wide; it was back water and would run up of that width as far as School street; at a 6 feet stage of water, the water would just go through; there was always some water when the river was the lowest; at a 5 or 6 feet stage of water, between the island and the main shore, the water would be 30 or 40 feet wide; the higher the water the wider it would be. At the time of the trial the pavement of South avenue came out to the slough; the pavement is just in front of the fences of the lot holders. At the corner of School street there had been filling out about 200 feet each way. A survey was made on behalf of the plaintiffs; by it the north line of South avenue would come inside, over Bank lane; there was a little interference by the line of South avenue with Bank lane, the most would be 10 or 15 feet; South avenue lies towards the river more. The edge of South avenue at the bank of the river is a steep descent; its width is not, filled out, 60 feet; at the upper end it is filled out into low ground, and then it runs into a kind of a wet place or swale, where there had been land at one time; the south line of the patent goes beyond the high- and low-water lines as established by the commissioner; about 10 acres of the channel of the river, beyond the low-water line of the commissioners, is included within the patent lines. When there were 5 or 6 feet of water in the river, the whole of the island would be submerged. By a sudden fall in the river, the water between the island and the main land would be left in ponds, between which there would be wide spaces, so that the place of the channel could be walked over easily; the deepest water was at the head of Kill-

buck island; in ordinary stages of water there was a channel; boats would go through; when the river was well up the space between the river and the end of the lots was quite narrow, there was just a pathway around the fences of the lots. The bank was low where Bank lane came down to School street. Between the island and Bank lane there was a slough; at the point where that lane came down to the river at the top of the island, it was wider and got narrower as it went down. The slough was formed by the water coming in at the head of the island, and the drainage from a little run from the hill; it was never dry.

The defendants gave evidence that the north line of Bank lane was not a straight line; it ran irregularly with the angles at lines of the lots. South avenue is a straight line; the southern line of the patent takes a large portion of the bed of the river; the area comprised within the lines of the patent is 90 acres 133 perches; the area between the high-water line and the north line of Bank lane is 62 acres 150 perches; the area embraced by the patent lines between the high- and low-water lines of the commissioners is 7 acres 98 perches; the area of the patent lying outside of the commissioners' low-water line is 20 acres 45 perches; these 20 acres 45 perches are covered with water at all stages; the patent measuring from low-water line toward Pittsburg takes 300 feet, which would leave about 740 feet for the channel to the low-water line on the Pittsburg side; the patent takes about 350 feet from the limit of the water-ways on the Ohio river as left by the commissioners; and where it encroaches most leaves about 850 feet of channel in the Ohio within low-water line; since the commissioners fixed the water lines, the city of Allegheny has graded Bank lane in a number of places, in conformity with those lines. They gave evidence further, that "Union bridge" was about 300 or 400 feet above Killbuck island. The witnesses varied as to the contents of the island from 3 to 15 acres. There was evidence that up to the year 1832, Killbuck island was as high as the main land and was never overflowed till then; in order to make a flow in channel between the island and the main land on the Allegheny City side, the stage of water must be 6 or 8 feet.

The testimony in the case was very voluminous; a very great number of deeds, plots and other documents were given in evidence, which are only referred to in the paper-books.

The foregoing, with the charge and opinion of Judge White and the opinion of the Supreme Court, will, it is believed, sufficiently present the case.

The plaintiffs requested the court to charge the jury:—

1. That if the jury believe, under the evidence, that the territory embraced in the writ, * * * is co-extensive with the territory of Killbuck, or Smoky island, as it once existed, then it was competent for the legislature to grant a valid title thereto, upon such

terms of payment as the legislature might choose to prescribe, and that the Act of 1873 does, if the jury find as above stated, confer a valid title upon the plaintiffs, as against the city of Allegheny.

Answer. " The first part of this point is affirmed, the latter is embraced in the reserved question."

2. That the averment in the Act of 1873, that the territory described in the patent and writ is co-extensive with the former territory of Smoky or Killbuck island constitutes primâ facie evidence of such coincidence, and should be so regarded by the jury; and that in passing upon the question of the existence and extent of the island in question the jury may consider, in connection with the averment of the Act of 1873, the old maps and plans in evidence and the testimony of the several witnesses, and that the application, appraisement and survey for Nelson in 1828 and 1829, are legitimate subjects for the consideration of the jury, whether that portion of the land in dispute was an island or not.

Answer. " Affirmed."

3. That the title of the various out lot owners, opposite to the territory in dispute, extended to and was bounded by the north line of Bank lane, as depicted upon the plan of " Reserve" tract.

Answer. " Affirmed, but they had an interest that extended to the river."

4. If the court refuses to charge as requested in the third point, then the court is requested to charge, that it is the function of the jury to find, under the evidence, where the south line of Bank lane ran, and that, in so finding, they may regard the fact that said Bank lane had a fixed and defined width at other points, east and west of the place in dispute, and the further fact that in maps and plans made and adopted by the city and in evidence, a definite and fixed width is given to Bank lane or South avenue, as evidence tending to show that Bank lane did not extend indefinitely to low-water line.

5. That the Act of 1858, establishing high- and low-water lines, was not intended to affect private titles, nor did it avail to disable the Commonwealth from making a valid grant of territory formerly occupied by the island and lying south of the low-water line as it existed at the time the reserve tract was laid out and sold.

6. That the plaintiffs have made out a primâ facie case, and that nothing has been shown by the defendants to prevent a recovery, and the verdict of the jury should be for the plaintiffs.

The 4th, 5th and 6th points were reserved.

The defendant asked the court to instruct the jury :—

1. That Bank lane from out lot No. 32 westward, as laid down in the original plan of the town of Allegheny and its out lots, was a street or public landing of indefinite width, extending to the low-

[Allegheny City *v.* Moorehead.]

water mark of the Allegheny river or Ohio, wherever the low-water mark might be.

2. That the application of Henry Killbuck, made in the year 1806, for Killbuck or Smoky island, and the valuation thereof then made, were ineffectual to vest title in Killbuck, or his alleged grantee, Abner Barker, because of the failure of Killbuck to pay to the Commonwealth any portion of the valuation, or to procure a warrant of survey or otherwise comply with the requirements of the Act of January 27th 1806 ; and if Killbuck or those claiming under him had any inchoate or possessory title to the island, the same was extinguished when the soil of the island was swept away by the flood of 1832, and the flood which occurred about ten years thereafter.

The 1st and 2d points were affirmed.

3. That the low-water line as fixed by the commissioners, under the Act of April 16th 1858, and approved by the final order of the District Court of Allegheny county, of June 27th 1861, thenceforth became the southern boundary line of Bank lane, now South avenue.

4. That the Act of April 28th 1873, and the patent issued under the same, did not invest the patentees with title to any land lying inside of the commissioners' low-water line, and the plaintiffs cannot recover any portion of such land.

The 3d and 4th points were reserved.

5. That in laying out the reserved tract and disposing of the lots according to the plan, the Commonwealth acted as an ordinary individual, and not as a sovereign ; and the purchasers of the lots from the state acquired the free and perpetual right of using Bank lane as a river landing or highway to and from the rivers ; and the state cannot grant any valid patent to cut off the said lots or the city of Allegheny from the Allegheny or Ohio river.

6. That the patent issued 29th April 1873, is inoperative to grant any land lying outside of the commissioners' low-water line and within the bed of the river as fixed by the commissioners and established by the final order of the District Court, pursuant to the Act of 16th April 1858.

The 5th and 6th points were affirmed.

7. That the subject of the Act of Assembly of April 28th 1873, to wit, the grant of a large tract of main land or river shore in the city of Allegheny, is not clearly expressed in the title of the act, viz. : " An Act to perfect the title to Killbuck island, &c. ;" and therefore said act contravened the second constitutional amendment of 1864, and is null and void.

Answer. " This point is refused, because under the ruling of the court, the plaintiffs are confined in the action to the boundaries of Killbuck island."

The court charged : * * *

[Allegheny City *v.* Moorehead.]

" The plaintiffs now claim title under, or by virtue of, the Act of 28th April 1873. That act recites the application of Killbuck, a sale by him to Abner Barker, a sale for taxes, the purchase by Zenas Neel, his death in 1834, and a conveyance by his heirs in 1849 to certain parties. It also refers to the decision of the Supreme Court in Reed's case, and then directs a patent to be issued to the vendees of Neel's heirs, on their paying to the state a certain sum per acre. In the conveyance by Neel's heirs the island is described by courses and distances, and calls for Bank lane as the northern boundary. These boundaries would embrace about eighty-four acres, or perhaps more. The Act of Assembly directs a patent to be issued for the same boundaries. The plaintiffs obtained their patent and brought this suit.

" The act is entitled ' An Act to perfect the title to Killbuck island, * * * authorizing and directing the surveyor-general to issue a patent therefor.' From the title of the act, and the recitals in the act, it is clear that the legislature did not intend to authorize or direct a patent to be issued for any more than what was Killbuck island. The declared intention of the act was to perfect the title to an *island*. The boundaries embrace more; they describe, not an island, but a part, apparently of main land, or at least bound the *island* its entire length on one side by the main land—Bank lane. These boundaries include the inner channel of the river, and a portion of the river-bed beyond the island. Perhaps the act in this respect is unconstitutional, because that part of it is not embraced in the title. But I regard the courses and distances given in the act as merely descriptive of the island, and not conclusive. As the declared object of the act was to perfect the title to the island, I shall confine the plaintiffs to the island. I therefore instruct you that the plaintiffs cannot recover any portion of the original bed of the river. They can recover no more than what was Killbuck island in 1806.

" But the city of Allegheny denies the plaintiffs' right to any recovery whatever; and on two grounds: 1st. That, as plaintiffs' patent is for an *island*, and there being no island or *land* there, the plaintiffs took nothing by their patent; and, 2d. That under the Act of 16th April 1858, fixing high- and low-water lines, the title to the *locus in quo* became vested in the city of Allegheny, or the lot owners.

" I doubt not the power of the legislature to authorize the reclamation of an island that has been swept away, and to give title thereto. This is what, I think, the legislature intended by the Act of 28th April 1873.

" But the more serious question arises under the Act of 16th April 1858. I wish to reserve that question for the consideration of the court in banc, and therefore instruct you that the plaintiffs are entitled to recover what was Killbuck island in 1806. Your

30 P. F. Smith—9

duties, therefore, will be to find what was Killbuck island in 1806—locate it and give its boundaries.

"The plaintiffs contend that Bank lane, or South avenue, as it is now called, is not now where it was originally ; that it has been gradually shoved southward; that it is now where the channel was formerly; that its southern boundary—allowing it to be eighty feet wide—would reach over to low-water mark of the island in 1806. If you believe from the evidence that such is the fact, then you may bound the island on the north side by Bank lane, or South avenue. My instructions are that you are to bound the island on the north, and at its head and foot by what was low-water mark of the island of 1806. But on the southern side, that is, the side next to the main channel of the river, the plaintiffs cannot recover beyond the low-water line fixed by the commissioners, under Act of 1858. Their patent lines would extend some 300 feet beyond that. But I think it is fair to presume that the legislature did not intend to interfere with the lines fixed by that commission. I therefore limit the plaintiffs' right to that line. I consider it so important to maintain the high- and low-water lines as fixed by that commission, that I am unwilling that this court shall give any countenance to the idea that private property holders, or the corporations, have any rights beyond the low-water line fixed by the commissioners.

"If you find that Bank lane has not been shoved southward as far as claimed by the plaintiffs, you must determine from the evidence the northern boundary of the island and its distance from the northern line of Bank lane.

"You will locate and define the island as it existed in 1806, according to the foregoing instructions, and find for the plaintiff, subject to the opinion of the court on the question of law reserved, to wit: Whether by virtue of the Act of 16th of April 1858 (fixing high- and low-water lines), and the subsequent proceedings under that act in the District Court of Allegheny county, the island having been previously swept away, and the foundation thereof being a bar at low water, and the river-bed at high water ; the said foundation became attached to the main land, and the title thereto became vested in the city of Allegheny, or the lot owners."

The verdict was :—

"We find for the plaintiffs all that certain tract of land bounded and described as follows : Beginning on the low-water line as fixed by the commission and District Court of Allegheny county, in pursuance of the Act of 16th April 1858, at the distance of 215 feet up the river from the centre of the Union bridge ; and thence by a line northward and parallel to said Union bridge and the embankment thereof, to low-water line of Killbuck island, as indicated * * * on the draft, &c., * * * which is returned herewith

[Allegheny City *v.* Moorehead.]

and attached to this verdict; thence down the north channel or branch of Allegheny river, as marked in the said plan, * * * which the jury find was the low-water mark of said island in 1806, to where it strikes the low-water line of the said commission; thence up the said river by the said low-water line of said commission to the place of beginning. The said described boundaries being the whole of said Killbuck island down to the low-water mark, as the same existed in 1806, except that portion to the southward cut off by the low-water line as fixed by said commission. This verdict being subject to the opinion of the court in banc on the question of law reserved, to wit:—

. "Whether by virtue of the Act of April 16th 1858 (fixing high- and low-water lines), and the subsequent proceedings under that act, in District Court of Allegheny county, the island having previously been swept away, and the foundation thereof being then a bar at low water and the river bed at high water, the said foundation became attached to the main land, and the title thereto became vested in the city of Allegheny, or the lot owners."

The opinion of the court in banc on the reserved question was delivered July 1st 1875, by White, J., viz.:—

* * * "When the state, in 1787, laid out the reserve tract in lots, and caused a plot to be made of it, Bank lane was marked on the plot as running on the bank of the Allegheny river. The island was also indicated on the plot, with a narrow channel between it and the main land. But no distances were given. It was in evidence that Bank lane had been, to some extent, shoved southward, the plaintiffs contended, entirely across the original channel between it and the island. But the verdict of the jury shows otherwise.

* * * "The plaintiffs claimed the title under a patent from the state, issued in pursuance of a special act of the legislature, approved 28th April 1873. The boundaries of the patent embraced much more than the verdict of the jury. But as the declared object of the act was to perfect the title to the island, and the act recited the title or claim of the plaintiffs as derived from the Indian chief, Killbuck, who made application for the island in 1806, the jury were instructed that the plaintiffs were not entitled to recover more than the island. The recitals in the act, I consider of very little consequence in the decision of the reserved question. Killbuck never followed up his application, nor obtained any valid title. Whatever claim he had was forfeited by not getting a warrant of survey, and paying for the island, as required by the Act of 27th January 1806. But even if he had an inchoate title, and could have transferred it to Abner Barker, it became extinct when the island was swept away by the great flood of 1832. * * * And if by virtue of the Act of 16th April, 1858, the title became vested in the city of Allegheny or the lot owners, the state could not

afterwards grant it to another, In that case the Act of 28th April 1873 would be a nullity. The state might waive all preliminaries required by former Acts in order to perfect the title of an applicant. And no doubt the state would be bound by the recitals in the act. But the vested rights of others could not be thus legislated away. If the state had made a *gift* of this island, or its foundation, in 1858, to Allegheny City, she could not in 1873 revoke her gift, and *sell* it to another. Such an act would be inconsistent with the character and dignity of a sovereign state. In 1849, as decided in Reed's case, the island had ceased to exist, and there was no law authorizing the foundation to be taken up as an island. * * * If there were no intervening rights, the Act of 1873 would give a good title to plaintiffs without reference to Killbuck's title. But if there were intervening rights, Killbuck's claim cŏuld not be galvanized into a living title to defeat them.

"The title of the city or the lot owners must be derived, directly or indirectly, from the Act of 1858. They do not claim by express grant from the state or any other party. They do not pretend ever to have had title to the island. After the island was swept away the foundation remained as a bar in the river. They had no legal claim to that. It was the bed of the river. It was not *alluvion*. It was not a deposit or accretion, and no more attached to the main land than when the island existed. It was not a *reliction* nor an *avulsion*. It did not, therefore, fall within any of the recognised common law rights of riparian owners. And if the Act of 1858 did not extend these rights, or in some other way give them a title, they have none.

"Some claim has been set up for those owning what are called 'river' lots. These fronted the river, but did not extend to the river. The original deeds from the state describe them according to the plot, as bounded by the northern line of Bank lane. They do not call for the river, or run by the course of the river. The river is not given as a boundary. They are accurately described by courses and distances, and the southern line described as the northern line of Bank lane, which runs along the bank of the river.

"The law is well settled in this state, that when the survey or deed calls for a stream, or as running by, along, or up or down it, the owner takes titles to the stream; in the case of navigable rivers, to low-water mark, and those not navigable, to the centre or thread of the stream. 'But' as AGNEW, J., says in Wood *v.* Appal, 13 P. F. Smith 224, 'if the stream is not made the boundary, or if a line is actually run and marked for the survey apart from the stream, the rule changes to suit the facts of the case.' These lot owners, therefore, had a fee only to the northern line of Bank lane. Their title did not extend to the river. But they had an

[Allegheny City *v.* Moorehead.]

interest in the highway, the use of it, and a right to have it maintained as such; and so had all the other lot owners.

"The state, in laying out and selling lots in the reserve tract, acted as any other proprietor. She laid out lots with streets, alleys, &c., and sold according to the plot. She dedicated all the streets, alleys, &c., to public use. She made no deeds for these common highways, and the legal title remained in her. But she held the title for the use of her purchasers, and could not by subsequent conveyances part with the legal title so as to defeat or impair their rights.

"But it is said that the purchasers of the river lots had a river front and the state cannot deprive them of that. The Act of 1873 does not. When they purchased, there was an island between them and the main channel of the river. They fronted on a narrow, back channel. If the island should be restored they are no worse off than when they first purchased. If Bank lane should be extended by alluvion, or by operation of law under the Act of 1858, to a width of 600 or 800 feet, it would still be Bank lane, or a common highway. The legal title to the fee would be in the state, and the lot owners would simply have a use in it. They could not sell it or make title to it. It would be under the supervision and control of the city corporation, the same as other streets or highways. In this view of the case I cannot see what title or interest the lot holders can have in the *locus in quo*, separate from the city corporation; or, that may not be said to be vested in the city corporation as their representative and for their use.

"Let us then consider what title, if any, the city has. And this, as before stated, must be derived from the Act of 1858. The city, as a corporation, has not and never had, a fee in Bank lane nor any title or interest therein, except as one of the streets of the city."

The judge then referred to the Act of 1787, the Act of 1840 (incorporating the city of Allegheny), the Act of 1858, for ascertaining the water lines and the various proceedings under them, and further said:—

"The 5th sect. of the Act of 1858 is in these words: 'That all riparian right now vested in the state, lying between highwater lines and the rivers, within the district aforesaid, shall from thenceforth thereafter be vested in the several corporations within whose limits the same now is or hereafter shall be.'

"This section is obscure. It is uncertain whether it refers to the high-water lines then recognised, or the high-water lines to be fixed by the commissioners. It is also uncertain what is meant by 'riparian right.'" The section was probably added with no very definite idea of its meaning or application. If the state had any riparian rights along the banks, no doubt this section would

[Allegheny City *v.* Moorehead.]

confer them upon the corporations. But the section grants nothing more, and if the state had none, it grants nothing. At the *locus in quo* the state was not a riparian owner, and had no riparian rights to confer. Whatever may be its operation or effect elsewhere, it has no application here, and confers no right or title to the *locus in quo* to Allegheny City. The city cannot claim the island by virtue of this section.

" In the preamble, it is declared to be ' important ' to the owners of lands, persons navigating the rivers, and the corporations, ' to know and have their several rights and privileges, in extension and limitation, ascertained and defined;' and to ascertain and define these was one purpose of the act. Yet the act nowhere expressly declares or defines what these rights are. They can be ascertained and defined by inference only.

" The state, as a sovereign, owned the bed of the rivers, and had a right to pass such laws and make such regulations as were necessary and proper to improve the navigation, and protect and advance the interests of commerce, under the well-known and long-settled law of this state ; riparian owners hold a fee to low-water mark, but subject to an easement—the rights of the public to use the bank, between ordinary high and low water, for navigation and commercial purposes. In all navigable streams the currents are liable to change, and the banks to be washed away by floods, or be increased by deposits. High- and low-water lines, therefore, are constantly shifting, and the lines of the riparian owners advance or recede with the banks. The state, as a sovereign, has a right to ascertain and fix these lines, and in doing so, if slight changes are made in the banks, the riparian owners cannot complain. They hold their lands subject to this servitude.

" When the state has ascertained and fixed these lines, the ' rights and privileges, in extension and limitation,' of riparian owners, are definitely settled. They extend to and are limited by these lines. They may fill in and extend out the bank to high-water line, with a slope down to low-water line. But they can make no improvements, or cause any nuisance below high-water line to interfere with the public rights; or if the lines thus fixed come within the former recognised high- and low-water lines, they will be limited by the lines thus established. If they lose a small portion of their bank, it is *damnum absque injuria*, the same as if it had been swept away by a flood. Their absolute title is limited to the high-water line as fixed by the sovereign state. Beyond that, down to low-water line, the public have their rights, and they cannot interfere with them.

" These principles apply to corporations as well as private persons; to highways as to individual property. As a general rule, and in ordinary cases, I would have no hesitancy in holding that a street or highway bounded by the river, would extend out

[Allegheny City *v.* Moorehead.]

to low-water line as fixed by the commissioners, if that line was further out in the stream than the original low-water line. But the case we now have before us is peculiar, and I do not think is governed by these general principles. It is an exception to the general rule.

"It will be observed that there is no express grant in the act, except in the 5th sect., of 'riparian right,' which, as we have seen, has no application to this case. The act does not directly give any right or privilege to any person or corporation. Such rights as we have been considering are merely incidental to the object of the act, and such as may reasonably be inferred from it; but it is against the canons of construction to give a forced meaning to a statute, or to draw an unreasonable and absurd inference from it.

"The object of the act was to ascertain and definitely fix high-and low-water lines; not totally to change them. * * * Of course it was not intended that the lines should conform to the actual shore lines at that time. The lines were to be established for all time to come, and hence, by implication, a discretion was given to the commissioners to make such reasonable and proper changes as were necessary for the purpose stated in the act. At the *locus in quo* the lines were laid down in the bed of the river, from 500 to 1000 feet from the shore. It might be a question, whether, under the terms of this act, the commissioners and the District Court have power to locate these lines so far from the shore. No objections, however, were made at the time, or have been made since. It seems to be conceded on all hands that that portion of the river is unnecessary for the purposes of navigation, and might as well be filled up. But the facts have an important bearing on the question we are considering—what construction to give to the act. If the legislature had contemplated any such great change in the line at this point, would there not have been some provision in the statute in reference to the intervening space? Slight changes would not seriously affect any person or corporation, and the individual rights would naturally follow. But a great change like this, throwing the river line out 500 or 1000 feet, and adding 70 or 80 acres to the main land, involves questions and rights not contemplated by the legislature nor provided for in the statute.

"If, by construction of the statute, the *locus in quo* passes to Allegheny City, it passes simply as an accretion to Bank lane. That highway would then be a curious anomaly. From an ordinary street, at both ends, it would swell out to a thousand feet in the middle. But in point of fact it would be useless as a highway. It would cost more to fill up the river than the city could afford to spend for a highway, or even for a park; unless sold for manufacturing or building purposes, it will never be filled up. It will

always remain an eye-sore and bone of contention. Although claiming it for many years, yet the city has never thought of filling it up for public use. She has always contemplated extending her streets through it, and laying it off in lots for sale. Whether she could do so without express legislation authorizing it is very doubtful.

" We are, therefore, of the opinion that the title to that portion of the river bed, between Bank lane and low-water line, as fixed by the commissioners and the District Court, did not pass to or vest in the city of Allegheny, or the lot owners, under or by virtue of the Act of 16th April 1858. It is a *casus omissus*, a case not contemplated by the statute or provided for in it. The title, consequently remained in the state, subject to the control of the legislature.

" The reserved question is, therefore, decided in favor of the plaintiffs, and judgment is ordered to be entered for plaintiffs."

The defendant took a writ of error, and assigned for error,

1-4. Not affirming the defendant's 3d, 4th, 7th and 8th points.

5. Directing the jury to find for the plaintiffs.

6. Entering judgment on the verdict on the reserved question for the plaintiffs.

*W. B. Rogers* and *M. W. Acheson*, for plaintiff in error.—If a map made by the proprietor of lands on which a town is located is referred to in his deed for a lot, it has the same effect as if incorporated in the deed: Birmingham *v.* Anderson, 12 Wright 253. The deeds for these lots on Bank lane designate them as river lots and Bank lane is described as running by courses of the rivers; the plan according to which they were sold shows that Bank lane extended to the low-water line of the rivers. The water lines fixed by the commissioners under the Act of 1858 were between the state and the riparian owners and concern no others: Wainwright *v.* McCullough, 13 P. F. Smith 66. The low-water line of the commissioners became the southern boundary of Bank lane. The 5th sect. of the Act of 1858 vested in the city of Allegheny the title of the Commonwealth in the *locus in quo.* A riparian owner is entitled to accretions to his land from a river: Morgan *v.* Scott, 2 Casey 51; Angell on Watercourses, sect. 53–59; Municipal Corporation of New Orleans *v.* United States, 10 Pet. 662; Godfrey *v.* Alton, 12 Ill. 29; Jones *v.* Janney, 8 W. & S. 436; Cincinnati *v.* White, 6 Pet. 431; Barclay *v.* Howell, Id. 498. If the accretion to South avenue is not in the city, it is in the lot holders subject to the public easement: Angell on Highways, sect. 314, *et seq.*

*S. Schoyer, Jr., Hampton & Dalzell, A. M. Brown, G. Shiras, Jr., S. A. & W. S. Purviance, R. Woods,* and *G. P. Hamilton,*

[Allegheny City v. Moorehead.]

for defendants in error.—Where parties hold lots by deeds calling for a line along the bank of a river, the lots are bounded by the line and not by the river : Birmingham v. Anderson, 12 Wright 253 ; Woods v. Appal, 13 P. F. Smith 224 ; Banks v. Ogden, 2 Wall. 97.  The Act of 1858 is not applicable to boundaries between private persons : Wainwright v. McCullough, 13 P. F. Smith 66 ; Zug v. Commonwealth, 20 Id. 138; Poor v. McClure, 27 Id. 214.

Chief Justice AGNEW delivered the opinion of the court, January 6th 1876.

The action in this case was an ejectment, and the question was one of title only.  If the plaintiffs exhibited a valid title, and the city of Allegheny showed none in itself or its citizens, the municipal power of the city over its highways, or its possession of the rights of the state between the lines of high and low water, were no defence to a recovery.  The title to Killbuck or Smoky island was therefore the only question.  There was no title to this island in any one before the passage of the Act of 28th April 1873. Killbuck, the original claimant, had none, and his assigns were in no better condition.  Unless the state had granted a title to the lot owners, or to the city of Allegheny, there was nothing in her way to prevent the passage of the Act of 1873.  The fact that the island had been washed away, prevented a grant of the stony or sandy bottom on which it had rested under the ordinary land laws of the state or usages of the Land Office : Allegheny City v. Reed, 12 Harris 39 ; Poor et al. v. McClure, 27 P. F. Smith 214.  But this was no barrier to an express grant by special law.

The Act of 28th of April 1873 was entitled " An Act to perfect the title to Killbuck island, at the head of the Ohio river, north and west of the point in the city of Pittsburg, authorizing and directing the surveyor-general to issue a patent therefor."  The court below construed this act to embrace Killbuck island only, and not all of it, for the judge limited the survey to the natural low-water line of the island on its north side, as it was in 1806 ; and on the south side of it, to the low-water line fixed by the commissioners under the Act of 1858, which leaves out a part of the south side of the island as it stood in 1806.  The verdict was rendered accordingly, limiting the plaintiff's recovery to the natural low-water line of the island on the north side, that is, on the side next to the main land.  If there were any error in this instruction, upon which we give no opinion, it was one of which the city can not complain.  The question of discrepancy between the title of the Act of 1873 and its body, is therefore not before us.  The Act is good to the extent of the recovery : Dorsey's Appeal, 22 P. F. Smith 192; Allegheny County Home's Case, 27 P. F. Smith 77.

The plaintiffs having shown a good title to the land embraced in the verdict, what title was shown in the defence ?  There is no

[Allegheny City *v.* Moorehead.]

pretence of an express grant of the island to any one else ; but it is contended that there was a title in the owners of the lots bounded by Bank lane on the main shore opposite the island, which may be extended to the island ; or, if not in them, there is a title in the city, under the fifth section of the Act of 16th April 1858, authorizing the establishing of high- and low-water lines. There was no title in the owners of the lots bounded by Bank lane. These lots were laid out by the state on her own property (the reserve .tract), and were made to bound on streets and lanes, and on each other, just as the other lots of the town were. Bank lane was laid out upon the north bank of the river following its windings, and its northern line was made the southern boundary of these lots. They did not cross Bank lane to the river. If the doctrine of Paul *v.* Carver, 2 Casey 222, as to boundaries by the thread of a highway, were applicable to such a case as this, it would extend the title of the lot owners only to the middle of the highway, and not across it. Their interest on the south side was not a title to the soil, but an easement in common with all others in the use of the street, a use necessarily bounded by the water line, for the land highway could extend no further. At that line the water highway began, and the public right in it was such only as could be claimed by all citizens, in the use of the stream for navigation and other purposes. The verdict of the jury having established the natural low-water line of the island on its north side, necessarily established as a fact the existence of a channel between the north side low-water line of the island and the main land opposite to it, upon which Bank lane was laid out. On no principle of law or of legal inference could the title of the lot owners bounded by the north side of Bank lane cross this water channel. It is obvious, therefore, they had no title to oppose to the recovery of the plaintiffs below as bounded by the verdict. It is conceded upon the facts of the case, that it is not one of accretion to the land highway (Bank lane), either by alluvion or by reliction. Bank lane was widened by deposits made by the owners of lots or others, and has been extended still further by the act of the city, and a new name given to it of South avenue, and its width laid out at sixty feet. But these are not to be likened to an accretion by gradual deposits of sand or alluvium, or to an enlargement by a dereliction of the waters of the stream. They were not such acts as would confer a title where none existed before.

On the other hand, the old channel between the former island and the main land has not been obliterated, much of it remaining in the form of a muddy slough or pond ; in time of low water, useless as a highway by land or water, and covered with water in ordinary high stages of the river. That the land lying between the natural low-water line of the former island and the main land, or South avenue, belongs to the state, must, therefore, be conceded,

[Allegheny City *v.* Moorehead.]

unless she has parted with her title by the words or the operation of the Act of the 16th of April 1858, authorizing the establishment of high- and low-water lines.  It is not pretended there is any express grant of the land itself lying between these lines, to be found in the words of the act, unless it can be inferred from the language of section 5, in these words: "That all riparian right now vested in the state lying between high-water lines and the rivers, within the district aforesaid, shall thenceforth thereafter be vested in the several corporations within whose limits the same now is or hereafter shall be." This is no grant of the soil—it is not the language the state uses when she grants her lands. Nor can a grant of the land be derived from these words by any proper inference.  They apply to *all* the lands within the high-water lines, and the rivers along the three rivers within the prescribed limits, viz.: from a line crossing the Allegheny river at the northeast line of the borough of Sharpsburgh; from a line crossing the Monongahela river, opposite the mouth of Four Mile run; and from a line crossing the Ohio opposite to the mouth of Wood's run, and around the shores of all the islands in the rivers aforesaid, and within the limits aforesaid.  To assume an intention to grant the land itself between the high-water lines and the rivers within these limits would violate the vested rights of all the owners of the lands bounded by these rivers, within the prescribed limits.  Such clearly was not the intent of the legislature, and we cannot assume one intent for this locality at the island and a different intent for all other places.  But the legislature carefully guarded its own meaning by vesting in the several corporations only the *riparian* rights of the state, viz. : such as pertain to the banks of the rivers. They were limited also to the space between the high-water lines and the *rivers*.  Hence they did not include the channels, beds or bars of the streams.  By no possibility, therefore, can the Act of 1858 be construed to be a grant to the city of Allegheny of the bed of the channel between the former island and Bank lane or South avenue, or of the sand or gravel banks left by the washing away of the island.  Bank lane, or South avenue, not being increased by natural alluvium, or by the falling away of the waters, its increased width divested the state of no right of soil.

Nor can the operation of the Act of 1858 be extended by the act of the commissioners in running out the low-water line of the northern shore of the river to include a part of what was Killbuck island.  It was not the purpose of the commissioners to transfer titles, but to mark the boundaries of *riparian* rights, so as to make them certain and permanent in their extent.  So it was not the intention of the framers of the Act of 1858 to pass titles to lands, or to ascertain boundaries between individuals; but it was their purpose to regulate the right of navigation along the shores of these rivers by establishing high- and low-water lines, which

[Allegheny City *v.* Moorehead.]

would definitely ascertain and fix the extent to which the right could be exercised; and the extent to which the owners of the land could exercise their own rights under the law of the state. The purpose of the act is so clearly seen upon its face, and is so conclusively shown in the cases of Wainwright *v.* McCullough, 13 P. F. Smith 66; Zug *v.* Commonwealth, 20 Id. 138; Poor *et al. v.* McClure, 27 Id. 214, and in the opinion of Judge White in this case, it cannot admit of further discussion. The extension of the low-water line of the northern shore of the river over a part of the former site of the island, did not pass the title of the state to the intermediate channel, or to the bars and sand or gravel banks within the lines, or to the soil of Bank lane, to any one else, and certainly not to the owners of the lots bounded by the northern line of Bank lane. The state herself being the owner of the land or soil before the establishment of the low-water line of the commissioners, to her alone could any benefit accrue. If it could be conceded for a moment that the act operated on the title at all, she was the owner certainly of the southern half of Bank lane, conceding, for the sake of argument, the doctrines of Paul *v.* Carver to apply to this case. Being the owner of the soil beneath the southern half of the highway (certainly to this extent), and of the intermediate channel and beds and bars of the river, clearly the same title remained to her after the fixing of the commissioners' line, and she could grant it away by special act to others, subject only to the public easement in the highway, and to the right of navigation upon the river. There was no question of public easement or right of navigation involved in the trial below, so that the title of the state being vested in the plaintiffs by the special Act of 1873, they were entitled to recover the land included in the verdict, leaving the question of public easement, if any exists, to be determined when it shall arise.        Judgment affirmed.