## MURRAY v. CITY OF ALLEGHENY.

(Circuit Court of Appeals, Third Circuit. October 4, 1904.)

### No. 5.

1. MUNICIPAL CORPORATIONS—POWER TO CONVEY PUBLIC GROUNDS—INJUNCTION.

    A municipal corporation has no implied power or authority to convey away for private purposes property dedicated to or held by it for the public use, such as ground, lying between lots fronting on a navigable river and low water-mark, dedicated by the original plat by which the lots were sold as a public highway to give lot owners and the public access to the water front, and at suit of a lot owner a court of equity will enjoin such conveyance, when not expressly authorized by statute.

2. SAME—GRANT FOR PUBLIC USE—RAILWAY TRACKS ON WHARF.

    A grant by a city to a railroad company of the right to lay its tracks to and upon a public wharf is for a public use, and within the city's power.

    [Ed. Note.—For cases in point, see vol. 36, Cent. Dig Municipal Corporations, § 1532.]

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

M. A. Woodward, for appellant.

Stephen G. Porter, for appellee.

Before ACHESON and DALLAS, Circuit Judges, and KIRKPATRICK, District Judge.

ACHESON, Circuit Judge. Victoria Murray, a citizen of the state of Maryland, and the owner in fee simple of a lot of ground in the

city of Allegheny, Pa., abutting on River avenue (formerly Bank lane), brought this bill in equity to restrain the alienation by said city of certain land pursuant to an ordinance then pending in the city councils and about to be passed. The ordinance contained a proposed article of agreement which the mayor, by the terms of the ordinance, was authorized and directed to execute, in behalf of the city, with the Pittsburgh & Western Railway Company, a corporation, and its receiver, Thomas M. King (designated "the parties of the first part"), whereby, in consideration of the payment by the railway company of certain specified sums toward the cost of the improvement of South avenue and River avenue, on which property of the railway company abuts, the city of Allegheny agreed to "execute and deliver to the parties of the first part, their successors and assigns, a quit claim deed conveying and releasing unto the said parties of the first part, all its right, title and interest, of in and to all that land commonly known as the 'old inner channel' between the south line of Bank Lane or South Avenue, and the north side of Smoky or Killbuck Island; and that it will not at any time hereafter, in any way or by any means, question or dispute the title of the parties of the first part thereto." By the proposed agreement the city was also to grant to the said railway company the right to lay additional track upon the Allegheny wharf from Darrah street to Herr's Island Bridge.

The Pennsylvania act of assembly of September 11, 1787 (2 Smith's Laws, p. 414), authorized the president or vice president in council to cause to be laid out and surveyed a town, in lots and outlots, upon a tract of 3,000 acres, reserved to the use of the state in and by the act of March 12, 1783, and described in those acts as "an oblong of not less than one mile in depth from the Allegheny and Ohio Rivers and extending up and down said rivers from opposite Fort Pitt so far as may be necessary to include the same"; and the act of September 11, 1787, declared that "the streets, lanes and alleys of the said town and outlots shall be common highways forever." Accordingly, a plan of a town of lots and outlots was laid out upon said reserved tract along and upon the Allegheny and Ohio rivers, and was named "Allegheny," and the plan was duly placed upon record in the Surveyor General's office of the commonwealth. Subsequently the commonwealth sold these lots and outlots in accordance with this plan.

The master's report in the present case contains the following finding of fact, which the evidence fully sustains:

"(3) That along the banks of the Ohio and Allegheny rivers a highway was laid out, as shown upon said plan, for the lots named by the said council as river lots, and for the lots in said plan and for public use, and for public access to the said rivers, and this highway extended in width from the abutting lots to the rivers at low-water mark, and was named by said council 'Bank Lane.' And the establishment of the said Bank lane was to give, and did give, the rights of access and river privilege and wharfage to the said river lots, and to the said town and to the public."

No defined width was given to Bank lane by said plan. As shown by the plan, the south line of the river lots is the north line of Bank lane, and the latter widens and extends laterally to the rivers.

By the act of April 14, 1828 (P. L. 368), it was enacted "that Allegheny town, in the county of Allegheny, shall be, and the same is hereby, erected into a borough, which shall be called Allegheny, and shall be comprised within the following boundaries": and then follow the courses and distances of the boundary lines, which on the river side of the described survey run up the middle of the Ohio river and the middle of the Allegheny river. These borough boundaries, including those to the middle of the rivers Ohio and Allegheny, were again declared and confirmed by the act of April 14, 1838 (P. L. 458).

By the act of April 13, 1840 (P. L. 310), the borough of Allegheny became the city of Allegheny, the twentieth section enacting "that all property and estate whatever, real and personal, of the borough of Allegheny, are hereby vested in the corporation or body politic of the city of Allegheny, and their successors in and by this act established by the name, style and title aforesaid, to and for the use and benefit of said citizens, forever."

It appears from the evidence in this case that when the town of Allegheny was laid out, and thereafter until about the year 1840, there was an island known as Killbuck or Smoky Island in the Ohio river, with its upper end extending to or into the mouth of the Allegheny river. As shown by the original plan of the town, this island was surrounded by the waters of the Allegheny and Ohio rivers, and was separated from Bank lane by a channel in which part of the river ran, although the main channel of the rivers was on the other or southern side of said island. The site of this island is within the statutory boundaries of the borough of Allegheny and city of Allegheny.

On the 28th of April, 1873 (P. L. 860), the Legislature passed "an act to perfect the title to Killbuck Island," and "authorizing and directing the Surveyor General to issue a patent therefor." Accordingly, a patent was issued to the persons named in the act. These patentees, and others claiming under them, brought an action of ejectment against the city of Allegheny for the land embraced in this act and patent issued under it. There was a verdict for the plaintiffs in that action, and judgment in their favor was given on the verdict, but the recovery was limited to the natural low-water line of the island on its north side (that is, on the side next to the mainland) as the island was in 1806. Allegheny City v. Moorehead et al., 80 Pa. 118.

The decision in Allegheny City v. Moorehead et al., supra, related exclusively to the title to Killbuck Island as it was defined by the verdict of the jury, and did not determine the question of title to the soil lying between the natural low-water line of the island on its north side as it was in 1806 and the mainland. In delivering the opinion of the Supreme Court, Chief Justice Agnew, in stating the issue involved in the action, said, "The title to Killbuck or Smoky Island was therefore the only question." 80 Pa. 137. And again he said, "There was no question of public easement or right of navigation involved in the trial below." 80 Pa. 140. In referring to that adjudication, the master in this case, we think, was quite right in saying, "No express decision, however, is made as to the effect of

the act of Assembly of Pennsylvania approved April 13, 1840, on the title to or right of the city in the soil under the old channel."

It appears from the master's report, and otherwise, that at the particular locality with which we are here concerned the city of Allegheny by municipal action gave to Bank lane the new name of "South Avenue," and laid out and opened it at the width of 60 feet, measuring from the south line of the river lots. Now, as we have seen, the city proposes to quitclaim "all that land commonly known as the 'old inner channel' between the south line of Bank Lane or South Avenue and the north side of Smoky or Killbuck island." This description, it seems to us, was intended to embrace, and does embrace, all the land between the south line of South avenue as located and fixed by the city and the north side of Killbuck Island. The words "commonly known as the 'old inner channel' " do not limit the scope of the grant. In our judgment, the proposed quitclaim would be clearly hostile to and in derogation of the rights of access to the rivers across Bank lane, and to the riparian easements recited by the master in his third finding, which were secured to lot owners and to the public by the establishment of Bank lane in and by the original plan of the town of Allegheny. The obvious purpose of the threatened quitclaim is to extinguish those rights and easements at the locus in quo.

We do not deem it necessary to discuss or to express an opinion upon the question whether the legal title to the soil of the old inner channel is still in the state, or became vested in the municipal corporation for public uses. The city assumes to have title thereto, and proposes to execute a quitclaim deed conveying the same, with the extraordinary covenant "that it will not at any time hereafter, in any way, or by any means, question or dispute the title of the parties of the first part thereto" (its grantees). Any suggestion that the proposed quitclaim deed will not or may not operate to convey a good legal title to the soil of the old inner channel is quite immaterial here.

As respects the proposed quitclaim, this case, we think, falls within the well-settled rule of law that a municipal corporation has no implied power or authority to convey away for private purposes property dedicated to or held by it for the public use. Commonwealth v. Rush, 14 Pa. 186, 196; Dillon on Mun. Corps. § 512 (2d Ed.), and § 650 (4th Ed.); Roberts v. City of Louisville, 92 Ky. 95, 17 S. W. 216, 13 L. R. A. 844. The city of Allegheny has no express legislative authority to make the conveyance in question. What is here proposed, it will be perceived, is an out and out conveyance in fee by the city to the railway company. Such an absolute conveyance of the land described in the recited ordinance and draft of the proposed article of agreement would be an abuse of municipal discretion and a breach of trust duty which a court of equity will restrain by injunction.

We think it clear under the authorities that the appellant complainant, as the owner of a lot of ground in the city of Allegheny, has the right to invoke the interposition of a court of equity to prevent the threatened illegal conveyance of the property in question. Pitts-

burgh's Appeal, 79 Pa. 317, 324; Crampton v. Zabriskie, 101 U. S. 601, 609, 25 L. Ed. 1070.

The proposed grant by the city to the railway company of the right to lay an additional railroad track upon and along the Allegheny Wharf from Darrah street to Herr's Island Bridge presents an entirely different question from the one we have considered above. In respect to this matter, the complainant appellant has not shown any ground for relief. The proposed use of the railway company of the wharf for transportation purposes is a public use, and the grant of such right of way is within the authority conferred on the councils of the city of Allegheny.

The decree. of the Circuit Court dismissing the bill of complaint is reversed, and the cause is remanded to that court with direction to enter a decree in favor of the complainant restraining and enjoining the defendant, the city of Allegheny, from conveying or releasing to the said railway company, by deed or other instrument in writing, the title of the said city to the property described in the recited ordinance and in the bill, with costs to the complainant.